[S. F. No. 22722. In Bank. June 16, 1970.]

VALARIE REMERS, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY,
Respondent; THE PEOPLE, Real Party in Interest.

## COUNSEL

Fred F. Cooper for Petitioner.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Derald E. Granberg and Timothy A. Reardon, Deputy Attorneys General, for Respondent and for Real Party in Interest.

## OPINION

**PETERS, J.**—Petitioner was charged with possession for sale of dangerous drugs. (Health & Saf. Code, § 11911.) After a hearing, the superior court denied petitioner's motion to suppress the evidence of the pills (Pen. Code, § 1538.5), and we issued an alternative writ of mandate.

This case is controlled by our decision in *Cunha* v. *Superior Court, ante* p. 352 [85 Cal.Rptr. 160, 466 P.2d 704], and accordingly we hold that the arresting officers did not have probable cause to arrest and search petitioner and that the evidence uncovered by the search is inadmissible.

At approximately 10:52 p.m. on July 24, 1969, Officers McCarthy and Lipgens of the Berkeley Police Department were standing in front of Pepe's Pizza Parlor on Telegraph Avenue.[1] Officer McCarthy observed petitioner standing outside Pepe's talking with a "hippie-type" male; she looked around "over either shoulder," removed a tinfoil package from her purse, and then "nodded in a motion that they both go into Pepe's." Officer McCarthy could not tell what was inside the tinfoil package. Officer McCarthy said to Officer Lipgens that " 'Valerie's got a deal going down,' " and the officers followed the couple into Pepe's. The officers approached petitioner, who was standing next to a table; Officer McCarthy said, "Valerie, why

---

[1]The facts set forth in this opinion are taken from the transcript of the hearing on the motion to suppress, held on October 9 and 14, 1969. The facts as adduced at that hearing are essentially identical to those adduced at the preliminary hearing on August 15, 1969; the few differences—which are not determinative—will be noted in footnotes.

don't we go outside and have a talk." At about the same time, he saw Officer Lipgens reach into petitioner's purse and remove the package from it.

Officer Lipgens had not seen petitioner holding the tinfoil package outside of Pepe's. Officer McCarthy brought petitioner to Officer Lipgen's attention when he said words to the effect that " 'Valerie is getting ready to make a deal.' " As they approached petitioner in Pepe's, Officer Lipgens noticed a tinfoil package in her purse; he could see only the large tinfoil wrapping, and not the individually wrapped packets contained inside the larger wrapping. He reached into her purse and removed the tinfoil package. The package contained Seconal tablets individually wrapped in tinfoil.

Officer McCarthy testified that he had been working with a special platoon in the department for about two months prior to and including the date of the arrest, and that he had made "numerous arrests" for narcotic violations during that period. He also testified that he had been informed by other officers that petitioner was selling dangerous drugs, but that he did not know of any officers who ever purchased narcotics from petitioner and that he did not know whether the basis of this information was an informer or some officer who observed petitioner make a sale; he did not see a "Rap Sheet" or any other official department records that dealt with petitioner. Officer McCarthy described the area around Pepe's as having "a reputation with the Police Department as being an area where there is a great deal of drug traffic, . . ." Finally, he testified that in his experience dangerous drugs were packaged either in plastic baggies or in tinfoil.[2]

Officer Lipgens testified that a few weeks prior to the arrest he had briefly discussed with Officer Oliver a previous arrest of petitioner for assault and possession of dangerous drugs,[3] and that Officer Oliver—who "handled" the previous case—had indicated that petitioner was not actually involved in the assault and that large quantities of pills were found in the apartment where the assault occurred and in petitioner's possession. Officer Lipgens testified that he had seen the "Rap Sheet" which reflected the above arrest, and that he recalled no other arrests of petitioner; however, he had made no attempt to determine whether the above charges against petitioner had been dropped, and, in fact, at the time of the hearing was unaware

---

[2] At the preliminary hearing, Officer McCarthy testified that dangerous drugs and "the pills" are generally packaged in cellophane bags, but that he had encountered them in tinfoil before. He also testified that for all he knew at the time he approached petitioner, the tinfoil package could have contained cookies, although he had a suspicion that it contained something other than cookies.

[3] At the preliminary hearing, Officer Lipgens testified that he had had no conversation concerning petitioner and her activities with any other officers, except Officer McCarthy.

that the charges against petitioner had been dismissed at a preliminary examination on April 30, 1969. Finally, Officer Lipgens testified that his experience was that Seconal tablets are usually packaged in tinfoil.

It was stipulated by the defense counsel and the prosecutor at the hearing that there was only one prior arrest of petitioner; that there was no evidence offered at the April 30 preliminary hearing as to any drugs found in the apartment where petitioner was arrested, other than those found in another person's pockets; that the charges against petitioner were dismissed at the April 30 preliminary hearing; and that the dismissal was prior to petitioner's arrest in the instant case. In addition, the prosecutor conceded that during the prior arrest no dangerous drugs were found on the person of petitioner.

The People contend that the officers had probable cause to arrest petitioner immediately before the search of her purse, and hence that the search was incident to a valid arrest.

■ "To constitute probable cause for arrest, a state of facts must be known to the officer that would lead a man of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person arrested is guilty." (*People* v. *Hillery,* 65 Cal.2d 795, 803 [56 Cal.Rptr. 280, 423 P.2d 208], and cases cited.) As with any intrusion upon an individual's personal security, "simple ' "good faith on the part of the arresting officer is not enough," ' " and "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" his suspicion. (*Terry* v. *Ohio* (1968) 392 U.S. 1, 21-22 [20 L.Ed.2d 889, 905-906, 88 S.Ct. 1868]; see *People* v. *Collins,* 1 Cal.3d 658, 662 [89 Cal. Rptr. 179, 463 P.2d 403].)

■ Where the events are as consistent with innocent activity as with criminal activity, a detention based on those events is unlawful (*Irwin* v. *Superior Court,* 1 Cal.3d 423, 427 [82 Cal.Rptr. 484, 462 P.2d 12]; *People* v. *Moore,* 69 Cal.2d 674, 683 [72 Cal.Rptr. 800, 446 P.2d 800]; *People* v. *One 1960 Cadillac Coupe,* 62 Cal.2d 92, 96 [41 Cal.Rptr. 290, 396 P.2d 706]); a fortiori, an arrest and search based on events as consistent with innocent activity as with criminal activity are unlawful.

In *Cunha* v. *Superior Court, supra, ante,* pp. 352, 355, 357-358, we held that no implication of guilt can be drawn from the fact that a suspect indicates an apparent concern with privacy by looking around to see whether anyone is observing him (cf. *Tompkins* v. *Superior Court,* 59 Cal. 2d 65, 68 [27 Cal.Rptr. 889, 378 P.2d 113]), and that a showing that an area is known to be the site of frequent narcotics traffic cannot convert into sufficient cause to arrest circumstances that are as consistent with

innocence as with criminality (*People* v. *Moore, supra,* 69 Cal.2d 674, 683). We also held that, although specialized knowledge may render suspicious what would appear innocent to a layman, the test remains whether the circumstances would warrant a man of reasonable caution—who possessed such knowledge—in the belief that the action taken was appropriate. (*Cunha* v. *Superior Court, supra, ante,* pp. 352, 358; cf. *Terry* v. *Ohio, supra,* 392 U.S. 1, 21-22 [20 L.Ed.2d 889, 905-906, 88 S.Ct. 1868].)

*Cunha* involved an arrest made by the same police officers—McCarthy and Lipgens—in the Telegraph Avenue area on the day before the arrest in the instant case. In that case, the officers observed defendant and a companion walking along a sidewalk " 'looking around. . . . [l]ooking back and to the side as to see if anyone was watching;' " the suspects stopped some 40 to 50 feet from the officers, continued to look around, and each one reached into his pants pocket; the companion appeared to extract an object, defendant extracted what appeared to be money, and the two placed their hands together in an apparent exchange. After approaching the suspects, identifying themselves, and receiving a negative reply to the query " 'were you two dealing,' " the officers placed them under arrest. We held that the officers did not have probable cause for the arrest and therefore the evidence uncovered by the incidental search was inadmissible.

The circumstances in the instant case provide less justification for arrest than did the circumstances held insufficient to validate the arrest in *Cunha.* The act of showing a tinfoil package to a companion is even less suspicious than that of engaging in a sidewalk sale. Neither officer was able to see the contents of the package or any impressions on the tinfoil wrapping, and Officer McCarthy himself admitted at the preliminary hearing that for all he knew at the time he approached petitioner, the tinfoil package could have contained cookies. Petitioner exhibited less concern with her surroundings than did the suspects in *Cunha;* and her apparent concern was consistent with innocent activity—such as keeping an eye out for acquaintances.

The fact that the area is known to be the site of frequent narcotics traffic cannot convert circumstances as innocent as those involved in this case—an individual being generally concerned with her surroundings while displaying a tinfoil package to a companion—into sufficient cause to arrest. As was the case in *Cunha*—which, like the instant case, involved an arrest in the Telegraph Avenue area—"[t]o uphold an arrest based upon these activities because the officers believed they were in an area of frequent narcotics traffic would abridge, if not abrogate, the Fourth Amendment's protection against police intrusions conducted without substantial justifica-

tion, and might well exacerbate community resentment of harassment." (*Cunha* v. *Superior Court, supra, ante,* pp. 352, 357-358.)

The People's reliance on the special knowledge and experience of the arresting officers is as misplaced as it was in *Cunha.* The People rely on the officers' knowledge that dangerous drugs are often packaged in tinfoil.[4] However, even if dangerous drugs are often packaged in tinfoil, so many other, legitimate items—such as foods or tobacco—are packaged in tinfoil that a tinfoil package is not a suspicious circumstance, and a man of reasonable caution who possesses the knowledge that dangerous drugs are often packaged in tinfoil would not be justified in assuming, upon seeing a tinfoil package, that it is likely to contain drugs. Similarly in *Cunha,* although the arresting officers were well aware that drug transactions often occur by means of street sales, so many legitimate transactions also occur by such means that the officers were not justified, as men of reasonable caution, in assuming that such a sale is likely to involve narcotics.

It is thus clear that in itself a tinfoil package is so commonly used for legitimate purposes that it is not a suspicious circumstance; as we have seen, Officer McCarthy himself admitted that as far as he knew the package could have contained cookies. And—as in *Cunha*—"the officers heard nothing of the conversation between defendant and [her] companion, and the record evidences nothing which would distinguish a layman's estimate of the suspiciousness of petitioner's behavior from the officers' estimate."

The People finally argue that we should give weight to the officers' knowledge of petitioner's "criminal record."

■ It is well settled that while it may be perfectly reasonable for officers in the field to make arrests on the basis of information furnished to them by other officers, "when it comes to justifying the total police activity in a court, the People must prove that the source of the information is something other than the imagination of an officer who does not become a witness." (*People* v. *Adkins,* 273 Cal.App.2d 196, 198 [78 Cal.Rptr. 397]; *People* v. *Lara,* 67 Cal.2d 365, 374 [62 Cal.Rptr. 586, 432 P.2d 202]; *People v. Rice,* 253 Cal.App.2d 789, 792 [61 Cal.Rptr. 394]; *People* v. *Pease,* 242 Cal.App.2d 442, 448-450 [51 Cal.Rptr. 448]; *People* v. *Harvey,* 156 Cal.App.2d 516 [319 P.2d 689].) To hold otherwise would permit the manufacture of reasonable grounds for arrest within a police department by one officer transmitting information purportedly known by him to another officer who did not know such information, without estab-

---

[4]It might be remembered, however, that Officer McCarthy testified at the preliminary hearing that, although he had "encountered them in tinfoil before," dangerous drugs are generally packaged in cellophane bags.

lishing under oath how the information had in fact been obtained by the former officer. (Cf. *People* v. *Adkins, supra,* 273 Cal.App.2d 196, 198; *People* v. *Harvey, supra,* 156 Cal.App.2d 516, 523.) "If this were so, every utterance of a police officer would instantly and automatically acquire the dignity of official information; 'reasonable cause' or 'reasonable grounds,' . . . could be conveniently fashioned out of a two-step communication; and all Fourth Amendment safeguards would dissolve as a consequence." (*People* v. *Pease, supra,* 242 Cal.App.2d 442, 449.)

In sum, when an officer furnishes to another officer information which leads to an arrest, the People must show the basis for the former officer's information. ▆▆ More specifically in relation to the instant case, when an officer furnishes to another officer information as to alleged prior criminal activity of an individual relied upon for an arrest relating to subsequent activities of that individual, then the People must show the basis for the former officer's information. The absence of such a requirement would allow a police officer to manufacture reasonable grounds to arrest while circumventing the necessity of pointing to "specific and articulable facts" (*Terry* v. *Ohio, supra,* 392 U.S. 1, 21 [20 L.Ed.2d 889, 906]; see *People* v. *Collins, supra,* 1 Cal.3d 658, 662) justifying his suspicions.

▆▆ Officer McCarthy had known nothing about petitioner's "criminal record"—i.e., her arrest for assault and possession of dangerous drugs, the charges having been dismissed for lack of evidence. Officer McCarthy testified that he had known nothing of petitioner's prior activities other than what other officers had told him—that petitioner sold dangerous drugs. He did not see a "Rap Sheet" or any other department records that dealt with petitioner, nor did he know of any officers who had ever purchased drugs from petitioner. Indeed, he did not know whether the basis of the information given him was an informer or some officer who observed petitioner make a sale. The prosecution did not produce any of the officers who allegedly had informed Officer McCarthy about petitioner's narcotics sales.

In such a situation, Officer McCarthy's testimony as to his knowledge of petitioner's activities cannot be utilized as an ingredient in the probable cause equation. To do so would permit the manufacture of a known criminal background—in this case, sales of dangerous drugs by petitioner—within a police department by one officer transmitting information to another officer without establishing the basis for his information.

It might be pointed out that the prosecutor in the instant case admitted that Officer McCarthy's testimony that petitioner had been selling drugs

was "really pretty weak," since the prosecutor was unable to "trace that [testimony] back to its source."

Officer Lipgens testified that he had been informed by Officer Oliver that during the prior arrest large quantities of pills (dangerous drugs) had been found in the apartment where petitioner had been arrested and in petitioner's possession. This testimony can be given no weight, since it was conceded or stipulated by the prosecutor at the hearing that no dangerous drugs had been found on petitioner and that no evidence had been produced at the ensuing preliminary hearing as to any drugs found in the apartment, other than those found in another person's pockets.[5]

Officer Lipgens also testified that he had seen the "Rap Sheet" reflecting petitioner's prior arrest, but that he had made no attempt to determine whether the charges against petitioner had been dropped and did not even know at the time of the section 1538.5 hearing that the charges against petitioner had been dismissed.

We have held that a prior related *conviction,* when known by the arresting officers, has "at best only a slight tendency" to establish a present violation of the law (*People* v. *Gallegos,* 62 Cal.2d 176, 179 [41 Cal.Rptr. 590, 397 P.2d 174]; see *People* v. *Reeves,* 61 Cal.2d 268, 274 [38 Cal.Rptr. 1, 391 P.2d 393]); obviously, a prior related *arrest* where there is no conviction must have even less than a "slight tendency" to establish a present violation of the law. Where, as in the instant case, the charges upon which the prior arrest had been based were dismissed, not because of any legal technicality unrelated to the merits of the charges against petitioner, but because the charges had been held to be unfounded—because, in other words, petitioner had been found innocent of the charges—the officer's knowledge of that arrest should be given no weight. As petitioner states, to allow an arresting officer's knowledge of a suspect's prior arrest to convert into probable cause circumstances that otherwise would not constitute probable cause when the prior charges were dismissed because of insufficient evidence is "to hold that persons arrested on unfounded charges would thereafter become second class citizens, with lesser rights than other citizens."

In *Cunha,* we stated that police officers cannot utilize invalid arrests as a basis for estimating a particular location's crime rate and then utilize the resulting estimate in determining the reasonableness of an arrest and search

---

[5]This circumstance demonstrates the problems with accepting, without more, an officer's testimony about information purportedly given him by another officer. If there were no available report on the circumstances of the prior arrest and if Officer Lipgens' testimony by itself could have been considered as a factor determining whether he had probable cause to arrest, then the police officers—either advertently or inadvertently—would have manufactured reasonable grounds to arrest petitioner based on "knowledge" of a nonexistent circumstance.

in that location. (*Cunha* v. *Superior Court, supra, ante,* pp. 352, 357, fn. 1.) Similarly, we should not allow police officers to utilize arrests made on unfounded charges as a basis for estimating a particular individual's criminal involvement and then utilize the resulting estimate in determining the reasonableness of an arrest and search of that individual.

 The exclusionary rule is intended to deter arrests and incidental searches made by police officers on less than probable cause, by removing any incentive for making such arrests. (See *People* v. *Moore, supra,* 69 Cal.2d 674, 682.) To allow officers to bootstrap unfounded arrests into later justification for what would otherwise be unreasonable arrests and searches is to reintroduce a substantial incentive for police officers to make arrests on less than probable cause. At the worst, such a rule would encourage police harassment of particular individuals by encouraging multiple arrests of suspects on unfounded charges, which arrests the officers could utilize to uphold later arrests and searches. And, as we have seen, at the very least such a rule would make persons arrested on unfounded charges "second class citizens, with lesser rights than other citizens," by holding that they are susceptible to later, valid arrests and searches on lesser grounds than are necessary validly to arrest and search citizens in general.

 Accordingly, in the circumstances of the instant case, the information from the other officers and from the "Rap Sheet" may not be used to convert the innocent-appearing activities observed by Officers McCarthy and Lipgens into probable cause to arrest and search.

Let a writ of mandate issue as prayed.

Tobriner, J., Mosk, J., and Sullivan, J., concurred.

**WRIGHT, C. J.**—I concur in the order under the compulsion of *Cunha* v. *Superior Court, ante,* p. 352 [85 Cal.Rptr. 160, 466 P.2d 704], which decision in my opinion should be reexamined.

**BURKE, J.**—I concur in the order under the compulsion of *Cunha* v. *Superior Court, ante,* p. 352 [85 Cal.Rptr. 160, 466 P.2d 704].

**McCOMB, J.**—I dissent. I would deny the writ.