[Civ. No. 36223. Second Dist., Div. Five. Sept. 17, 1970.]

LINDA MARIE BETHUNE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Harry E. Weiss for Petitioner.

No appearance for Respondent.

Evelle J. Younger, District Attorney, Harry Wood and Daniel L. Lieberman, Deputy District Attorneys, for Real Party in Interest.

## OPINION

KAUS, P. J.—Petitioner seeks a writ of mandate to suppress certain evidence found in her purse after her arrest on July 15, 1969, which evidence forms the basis of a two-count information pending against her in the respondent court.

### FACTS

On July 14, 1969, Officer Tingirides obtained a search warrant from a magistrate permitting him to search apartment B at 4067 Abourne Avenue, apartment 9 at 4024 Gelber Place, single family residences at 4830 Macot Street and 2517 Alsace Street, the garage in the rear of the Alsace Street address, the "front house" at 2035 Harcourt Avenue, a 1968 Cadillac convertible, license number ZBP 887, a 1964 Oldsmobile convertible, license number MUZ 056, and the persons of Gustav Marchand, John Joseph Marchand and Glen Marchand. The warrant permitted search for narcotics and paraphernalia. It was issued on the basis of a lengthy affidavit prepared by Tingirides, the relevant portions of which we will summarize.

On May 1, 1969, an informant told Tingirides that Gus Marchand was dealing in heroin which he obtained from his brother John Joseph. One got in touch with Gus by calling the number 296-8183. On July 8 Tingirides, who was in the company of the informer, dialed that number. The informer said to whoever answered the call, "I want to try one of those $25 things." After he had hung up the informer told Tingirides that "the buy was set up for the Crenshaw Shopping Center." Tingirides gave the informer $25 and they drove to the shopping center where Gus "emerged" from a 1968 Cadillac, license number ZBP 887, walked directly to the informer and appeared to shake hands with him. Gus then left. The informer and Tingirides met at an undisclosed location and the informer handed Tingirides a balloon containing heroin and told him that he had received it from Gus.

Tingirides and the informer went through the identical procedure on July 9. This time Gus appeared in a 1964 Oldsmobile, license number MUZ 056. Again, after meeting Gus, the informer met with Tingirides and handed him a balloon of heroin which he had supposedly received from Gus in exchange for money furnished by Tingirides. During these two transactions the informer was at all times "within the visual sight" of Tingirides.[1] Before the two calls to the number 296-8183 were made, Tingirides checked it "with the telephone company and the number came back registered to an address at 4067 Abourne Avenue, Los Angeles, apartment B." A fellow officer, Sergeant Kissenger, had that location under surveillance at the time

---

[1] The affidavit does not disclose what other kind of sight Tingirides possessed.

of the July 9 transaction and later told Tingirides that at about the time when the telephone call was placed, Gus left the Abourne Avenue address and drove directly to the Crenshaw Shopping Center.

Between about noon on July 10 and late at night on July 13 Tingirides and other officers had Gus under more or less continuous surveillance. On July 10 Gus drove to the shopping center, where he met an unknown person with whom he appeared to exchange something. He then went to an apartment complex at 4024 Gelber Place where he stayed for one hour and twenty minutes. From there he drove to 2035 Harcourt Avenue for a 35-minute stay, to 4830 Macot Street for a 10-minute sojourn, back to 2035 Harcourt for a five-minute stopover and finally to an apparently empty house at 2517 Alsace Street. After a few minutes at that address, Gus drove back to 2035 Harcourt and from there he took himself to 4830 Macot Street where he finally came to rest until 6:30 p.m. when he drove to the Crenshaw Shopping Center. There he exchanged something with three females, one of whom was recognized by a fellow officer as a narcotic addict. That business completed, Gus returned to 4067 Abourne Avenue.

On July 12 Tingirides and other officers followed Gus—who on that day drove the Cadillac and was accompanied by his brother Glen—to various locations, one of which was 4024 Gelber Place. From there Gus drove to the Crenshaw Shopping Center where he had a conversation with an unknown male. At times Gus had performed certain maneuvers which the officer interpreted as a technique "used by people that suspect that they are being trailed and in the language of the streets is known as trying to 'shake a tail.'" After leaving the shopping center, Gus drove to 4839 Macot Street where two females, one of whom was petitioner, got into the car, which then drove to Disneyland. In the Disneyland parking lot "the vehicle made many random turns and appeared to be doubling back over prior routes as if attempting to lose any vehicle that may have been following" it. Eventually the party of four checked in at the Disneyland Hotel. They left at 8 p.m. and drove back to 4067 Abourne Avenue. After staying there for a few minutes they drove "in an evasive circuitous route" to 2127 Nadeau Street. Glen went into the house at that address for a few minutes and returned to the car, which left, driving the first 50 feet with its lights out. It proceeded to 4067 Abourne Avenue where the party stayed for 15 minutes. Thence they proceeded to 4024 Gelber Place (10 minutes) and finally drove back to Disneyland.

At 8:30 p.m. on July 13, a security man at the Disneyland Hotel told Tingirides that at some undisclosed time, when Gus and his companions were not in, an unknown caller had left the following message: "They needed delivery, you should take care of an old man and an old lady." The four then left Disneyland at 11:30 p.m. that night. They drove to 4067

Abourne Avenue, where Gus entered the apartment house for five minutes. The car then proceeded to a residence on Gibraltar Street where Gus and Glen entered the home. The two females drove to 4024 Gelber Place. There they waited for the men who arrived in an unknown vehicle 20 minutes later. When Tingirides arrived at the Gelber Place address, he saw two men sitting in a car. After Gus and Glen had arrived they went into the Gelber Place apartment house and were soon followed by these two men who stayed inside for a short time, emerged and left in their own car. Gus and Glen then came out, joined the ladies, and all four drove back to Disneyland.

Tingirides' affidavit then sets forth his substantial qualifications as a police officer specializing in narcotics investigations and his conclusion, from all that he had observed, that "Gus Marchand is traffiking [*sic*], dealing, and selling heroin; that he is being aided and assisted by Glen Marchand and John Joseph Marchand; that he is storing and hiding narcotics in at least five separate locations."

As noted earlier, the search warrant was issued on July 14. On July 15 Tingirides, who was in the company of other officers, arrested Gus, Glen and petitioner in the Cadillac at the intersection of Santa Barbara and Coliseum, which was a short distance from the Abourne Avenue address. The charge was "conspiracy to possess heroin for sale." No search of the car was conducted at that time because traffic was heavy, a crowd had started to gather and an atmosphere of commotion had begun. The arrestees were therefore taken to 4067 Abourne, apparently in a police vehicle. An officer drove the Cadillac to that address. Petitioner had left her purse in the car. It was taken into the apartment and searched. It was found to contain cocaine, a narcotic (Health & Saf. Code, § 11500) and benzedrine, a restricted dangerous drug (Health & Saf. Code, § 11910).

We now digress to discuss certain procedural aspects of the case. A preliminary hearing was held on October 2, 1969, before the same magistrate who had issued the search warrant. It appeared at that time that at some point, "before the search," Tingirides had altered the warrant to correct what he called a typographical error. One of the places which the warrant ordered to be searched was "apartment 9 of 4024 Gelber Place." Tingirides crossed out the "9" and the last two figures of "4024" and substituted the figures "15" and "48" in their place. On the basis of Tingirides' action, certain items which were discovered during a search of the Gelber Place address were suppressd by the magistrate and the criminal proceedings with respect to the Marchand brothers and certain other codefendants were dismissed. All that the People were left with after this rather massive investigative effort were, therefore, the charges against petitioner. The magistrate did not stop to determine whether the alteration of the warrant invalidated

the seizure of the items found in petitioner's purse, since she agreed with the prosecutor who specifically set out to prove that petitioner's arrest was valid based on probable cause and that the search of the purse should be upheld as incident to that arrest. It therefore need not matter whether the search warrant's command to search the Cadillac conferred authority to search the purse found in the vehicle or whether, if it did, the alteration of the warrant voided any authority to act pursuant thereto.

Other features of the preliminary hearing should be noted: In attempting to justify the seizure of the contents of petitioner's purse as being incidental to a valid arrest, the People examined Tingirides as their witness. We hold that one way or another the magistrate became entitled to consider the statements in his affidavit in support of the search warrant on the issue of probable cause to arrest petitioner.[2] In addition he testified that he had ascertained through the Department of Motor Vehicles that the Cadillac was registered to petitioner at the Abourne address and that he had had the intelligence division check for the name of the telephone subscriber whose number was the one called by the informer.[3]

---

[2]The defense gave the prosecutor a bad time in attempting to prove what facts Tingirides considered as supportive of probable cause to arrest petitioner. The magistrate's rulings were not consistent, but to the extent that she sustained the defense, she was clearly in error and we would be entitled to assume in the prosecution's favor almost anything, whether it was in the affidavit or not. (*Ovalle* v. *Superior Court,* 202 Cal.App.2d 760, 764 [21 Cal.Rptr. 385].) Besides, the defense stipulated to much, if not all of the information in the affidavit. In the course of stating an objection, defense counsel had said: ". . . *We will stipulate he knows about the activities.* If there is anything else besides the arrest report let him so state, but I don't think you and Mr. Zax, and everyone else, should sit here and have him recite *what is in the warrant and in the affidavit.*" (Italics added.)

Finally a large part of the information came in by reference when the court questioned Tingirides:

"THE COURT: At and prior to the time that the defendant Bethune was arrested, did you have any information in addition to the information that you have already related to us regarding the ownership of the car and the subscriber of the telephone? THE WITNESS: None other than the information that is set forth in the affidavit, your Honor. THE COURT: Relating, I take it, to the use of the automobile? THE WITNESS: To the use of the automobile, her accompanying the defendant Marchand to the Disneyland Hotel; the messages that were received there, their coming back and forth into Los Angeles."

[3]An objection to the consideration of the telephone number as part of Tingirides probable cause was overruled. We do not stop to inquire whether that ruling was erroneous under the principle restated in *Remers* v. *Superior Court,* 2 Cal.3d 659, 666-667 [87 Cal.Rptr. 202, 470 P.2d 11]: "It is well settled that while it may be perfectly reasonable for officers in the field to make arrests on the basis of information furnished to them by other officers, 'when it comes to justifying the total police activity in a court, the People must prove that the source of the information is something other than the imagination of an officer who does not become a witness.' (*People* v. *Adkins* [fn. omitted] 273 Cal.App.2d 196, 198 [78 Cal.Rptr. 397]; *People* v. *Lara,* 67 Cal.2d 365, 374 [62 Cal.Rptr. 586, 432 P.2d 202]; *People* v. *Rice,* 253 Cal. App.2d 789, 792 [61 Cal.Rptr. 394]; *People* v. *Pease,* 242 Cal.App.2d 442, 448-450

Finally Tingirides' surveillance of Gus had revealed that during a period of about a week in which petitioner's apartment had been under surveillance, Gus had spent four nights with her. Tingirides, however, did not know whether he was her boyfriend.

■ In the superior court the motion to suppress was submitted on the transcript of the preliminary hearing with a stipulation that "all objections made at the preliminary are here deemed made"[4] and that "either counsel may offer new objections." No such additional objections were made. It should therefore be noted that all of the statements in Tingirides' affidavit in support of the search warrant were properly before the superior court, for what they were worth, since they had been admitted at the preliminary hearing, by force of law, by stipulation and partly by testimonial reference. (See fn. 2, *ante*.)

The respondent court denied the motion to suppress on the express ground "that there was ample justification to make an arrest without a warrant, probable cause to believe that the defendants and all of them were involved in the narcotics trafficking." We agree.

It is not contended that the anonymous informer is classifiable as reliable. It must also be conceded that his production of heroin after the meetings with Gus at the shopping center on July 8 and 9 leaves something to be desired by way of corroboration, since he was not searched before the meetings, nor, apparently, afterwards. (*People* v. *Cedeno*, 218 Cal.App.2d 213, 221-223 [32 Cal.Rptr. 246].) Nevertheless, there is far more than the

---

[51 Cal.Rptr. 448]; *People* v. *Harvey*, 156 Cal.App.2d 516 [319 P.2d 689].) To hold otherwise would permit the manufacture of reasonable grounds for arrest within a police department by one officer transmitting information purportedly known by him to another officer who did not know such information . . . had in fact been obtained by the former officer. (Cf. *People* v. *Adkins*, *supra* [fn. omitted] 273 Cal.App.2d 196, 198; *People* v. *Harvey*, *supra*, 156 Cal.App.2d 516, 523.) 'If this were so, every utterance of a police officer would instantly and automatically acquire the dignity of official information; "reasonable cause" or "reasonable grounds," . . . could be conveniently fashioned out of a two-step communication; and all Fourth Amendment safeguards would dissolve as a consequence.' (*People* v. *Pease*, *supra*, 242 Cal.App.2d 442, 449.)" There may be a difference between information relating to suspicious or criminal conduct of the arrestee and routine intelligence gathered from reliable sources, which, if false, is easily demonstrable to have been so at a hearing. Our holding does not depend on the propriety of the magistrate's ruling on petitioner's objection which, as will be seen, was resubmitted at the motion to suppress in the superior court.

[4]We urge trial courts not to accept such a stipulation, but to insist that each objection made before the magistrate be articulately resubmitted in the superior court. We see transcript after transcript where it appears obvious that the superior court has not independently considered the magistrate's rulings and tarred itself with possible errors it might not have committed. (See *People* v. *Marquez*, 259 Cal.App.2d 593, 602, fn. 2 [66 Cal.Rptr. 615]; *People* v. *Griffin*, 250 Cal.App.2d 545, 549 [58 Cal.Rptr. 707].)

bare assertion from the informer that he had obtained the heroin from Gus. Regardless of the subscriber to whom the telephone number dialed by Tingirides was registered, the plain fact is that on each occasion the telephone call did produce Gus in the shopping center. Both times the informer had made a statement which the officer could reasonably believe to have been an offer to buy heroin and each time Tingirides personally observed some kind of transaction between Gus and the informer. All of the circumstances together certainly carry far more criminal color to the transactions than had been the case, for example, in *Cunha* v. *Superior Court,* 2 Cal.3d 352 [85 Cal.Rptr. 160, 466 P.2d 704].

We need not, however, decide whether Tingirides could have arrested Gus after the July 9 transaction. We are interested in petitioner's arrest six days later and in the subsequent search of her purse. Much happened in the meanwhile. On July 10 Gus had another transaction with someone at the shopping center. Then came his apparently aimless journeying back and forth between the Gelber, Harcourt, Macot and Alsace locations which was followed by another transaction at the shopping center. This time one of the persons whom Gus met was recognized as an addict by a fellow officer.[5]

The events of July 10 were followed by those of July 12 when, after expert precautions against being followed, the party of four which included petitioner drove to Disneyland, and back to the Abourne address. This was followed by a circuitous approach to 2127 Nadeau Street where Glen made what, by then, could reasonably be interpreted as a pickup or delivery of narcotics. Back at Disneyland, the next day, Tingirides learned about the message from an unknown caller which, again, he could reasonably interpret as a plea for narcotics. After a stopover at petitioner's apartment an apparent delivery was made, while petitioner and the other female drove to the Gelber address where two new customers were evidently waiting for Glen and Gus. It is perhaps arguable that until that time petitioner's involvement in Gus' activities was not of a nature which would arouse a reasonable suspicion that she was anything but a girlfriend who clung closely to a peripatetic boyfriend. The unusual circumstances, however, of the two women leaving the two men at one delivery point and preceding them to another, gives a different color to the activities of the two women and particularly to those of petitioner, whose automobile was being used in what was apparently Gus' business. Even if Tingirides had no reason to believe that petitioner was actually selling narcotics, he certainly had ample grounds for thinking that she was aiding and abetting Gus and Glen or was part of a

---

[5]Here an objection based on *Remers* v. *Superior Court, supra,* 2 Cal.3d 659, 666-667 would probably have been good. None was made.

criminal conspiracy. ▆ It is, of course, elementary that the officer was entitled to consider the totality of everything he had observed and that probable cause may result from the confluence of a number of factors none of which, singly, would be sufficient. (*People* v. *Sheridan,* 2 Cal.App.3d 483, 489 [82 Cal.Rptr. 695]; *People* v. *Superior Court,* 274 Cal.App.2d 7, 11 [78 Cal.Rptr. 757]; *People* v. *Gaines,* 265 Cal.App.2d 642, 646-647 [71 Cal.Rptr. 468]; *People* v. *Chrisman,* 256 Cal.App.2d 425, 451 [64 Cal. Rptr. 733]; *People* v. *Fritz,* 253 Cal.App.2d 7, 12-13 [61 Cal.Rptr. 247]; *People* v. *Gamboa,* 235 Cal.App.2d 444, 448 [45 Cal.Rptr. 393].)

▆ Moreover Tingirides had every reason to believe that Gus and his associates were engaged in the narcotics business on a continuing basis and that, at any given time, they themselves and any vehicles used by them would, if searched, yield contraband.

We therefore believe that petitioner was legally arrested on July 15. We readily agree with her that the search of her purse after she had become separated from it cannot be justified on the basis that it was incident to her arrest. (*Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034].) Until the Supreme Court decided *Chambers* v. *Maroney,* 399 U.S. 42 [26 L.Ed.2d 419, 90 S.Ct. 1975], on June 22 of this year, we could not have said with complete confidence that the search of the purse could be upheld on any other ground. (Cf. *People* v. *Webb,* 66 Cal.2d 107, 111-126 [56 Cal.Rptr. 902, 424 P.2d 342, 19 A.L.R.3d 708].) In *Chambers,* however, the court held that the rule which permits warrantless searches of automobiles because of their mobility if the police have probable cause to believe that they contain contraband and other seizable items, extends to the warrantless search of a car which has been immobilized by the arrest of its occupants. "Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.' But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. ▆ For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." (*Chambers* v. *Maroney, supra,* 399 U.S. at pp. 51-52 [26 L.Ed.2d at p. 428].) Given the right to search an automobile, we can perceive no constitutional limitation on the right to search the purse which petitioner had left in it. Some question was raised—and never resolved—whether petitioner voluntarily left the purse in the car or whether she was forced to do so

because she was immediately handcuffed. We do not see how a resolution of that problem could change the outcome. If petitioner voluntarily parted from her purse, it became part of the contents of the automobile.[6] On the other hand, had she been permitted to continue in possession of the purse, nothing even in *Chimel* could have prevented the police from looking inside.

In view of the conclusion that we have reached we need not consider the alleged invalidity of the entire warrant because of the Gelber Place alteration, or the abstract question whether a warrant which authorizes the search of an automobile, also authorizes the search of a lady's purse found within it when nothing is known about its owner except that she owns the car and has recently been an occupant in it.

The alternative writ is discharged. The peremptory writ is denied.

Aiso, J., and Selber, J.,* concurred.

---

[6]In *Chambers* the officers found evidence of a robbery in a compartment under the dashboard and in a glove which contained change and written evidence of another crime.

*Assigned by the Chairman of the Judicial Council.