Filed 5/2/14  P. v. Martinez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANCISCO MARTINEZ et al.,<br><br>    Defendants and Appellants. | B247670<br><br>(Los Angeles County<br>Super. Ct. No. BA391797) |

APPEAL from judgments of the Superior Court of Los Angeles County, Norman Shapiro, Judge.  Affirmed.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant Francisco Martinez.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant Henry Vides.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Kimberley J. Baker-Guillemet, Deputy Attorneys General, for Plaintiff and Respondent.

Appellants Henry Vides (Vides) and Francisco Martinez (Martinez) appeal the judgments after their "open plea[s]" of no contest to a 2011 assault with a firearm. (Pen. Code, § 245, subd. (a)(2).) [1] They also admitted the offense was committed for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subd. (b)(1)(B).)

Before trial, the trial court denied their motion to suppress pursuant to section 1538.5.

After indicating a sentence at the time of the pleas, the trial court sentenced Vides to a three-year middle term in state prison and sentenced Martinez to an four-year upper term in state prison. The five-year gang enhancement was imposed and stayed.

## CONTENTION

Appellants contend their motion to suppress should have been granted as the prosecutor, despite the defense *Harvey-Madden* objections, failed to call as witnesses at the hearing the officers who were the source of the detaining officer's information as to reasonable and probable cause. (*People v. Madden* (1970) 2 Cal.3d 1017 (*Madden*); *People v. Harvey* (1958) 156 Cal.App.2d 516 (*Harvey*).)

The contention lacks merit.

## BACKGROUND

The evidence concerning the events of the shooting is taken from the trial testimony of the victim adduced at trial prior to appellants' midtrial pleas.

At about 1:00 a.m. on December 12, 2011, Christian Rodriguez (Rodriguez) walked past a liquor store located at 3rd Street and Bonnie Brae Avenue in Los Angeles. He was on the way to his parked car, which was on the other side of a Laundromat in a parking lot. Rodriguez encountered Vides and Martinez who were sitting in a "dark-colored" car with chrome rims with an air

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

scoop on its hood in the first parking lot he walked past, located between the liquor store and the Laundromat. Vides and Martinez used their car to block Rodriguez's path along the sidewalk.

Vides, the passenger, asked Rodriquez whether he was an 18th Street gang member. When Rodriguez replied, "No," Vides inquired about whether Rodriguez "bang[ed]" any "hood," meaning a criminal street gang. When Rodriguez replied in the negative, Vides called him names. Rodriguez challenged Vides to get out of the car, but the youths did not respond. Rodriguez continued walking in front of the Laundromat to his car and drove off.

The area where appellants confronted Rodriguez was the territory of the 18th Street gang. Rodriguez testified he was not gang-involved.

When Rodriguez drove off, he saw Vides tagging "M.S.," the initials for another criminal street gang, on a wall while Martinez acted as a lookout. Appellants then got into their car and followed Rodriguez to a stop light. They pulled up alongside Rodriguez and stopped on his right-hand side. Vides, the driver, leaned back, and Martinez, the right front passenger, leaned forward. Vides shot twice at Rodriguez through the open car windows. The gun clicked and apparently misfired. Rodriguez sped off, then braked to let appellants drive ahead of him. He followed his assailants a short distance and attempted to obtain the number of the license plate on their car.

Rodriguez telephoned 9-1-1.

Los Angeles police officers arrived, and Rodriguez described his assailants' car as a two-door Honda, which was dark–colored and either blue or black. It had an after-market air scoop or intake duct on its hood and chrome rims. The gun was "like black shiny silverfish . . . with a little circle thing in the middle." He further described the handgun as having "some sort of" a "round barrel-type cylinder on it." His assailants were male Hispanics in their mid-20's. Both men were "bald"; one man was slightly thinner and stockier than the other. One man

3

wore a light-colored hoodie; the other was wearing a dark-colored hoodie. Martinez had little hair on his chin.

The next evening, at about 11:15 p.m., Rodriguez saw his assailants again. They were driving the Honda at the same location. He telephoned 9-1-1.

A few minutes later, Los Angeles police officers arrived at his location. The officers drove Rodriguez several blocks away, and Rodriguez saw the Honda. He identified the Honda as that used in the shooting. In separate field line-ups, Vides and Martinez were removed from the police cars, and Rodriguez identified appellants as his assailants.[2]

## THE SEARCH AND SEIZURE MOTION

Before trial, appellants moved to suppress evidence pursuant to section 1538.5.

1. *The detention and search.*

Los Angeles Police Officer Darius Trugman (Officer Trugman) was the only witness who testified at the search and seizure hearing. He was a patrol officer working the 3:30 p.m.-to-early-morning shift. At 11:15 p.m. on December 12, 2011, he stopped a black Honda Civic with chrome rims and an air scoop on its hood a half block north of 6th Street on Rampart Boulevard in Los Angeles.

Officer Trugman testified he had stopped the Honda based on the description of the vehicle and the suspects in a gang-related shooting. That shooting had occurred shortly after midnight during his prior shift on that same date, some 11 hours earlier. The early-morning shooting had occurred at 3rd Street and Bonnie Brae Avenue, a half to three quarters of a mile from the detention scene.

---

[2] At the preliminary hearing, Rodriguez essentially testified to the same course of events.

Officer Trugman described how that evening, he was on patrol on 6th Street when he received yet another radio call concerning the shooting. Four to five seconds after receiving the radio transmission, he and his partner turned right onto Rampart Boulevard. When they turned the corner, Officer Trugman saw a black Honda that was driving southbound turn out its lights midblock and pull to the curb and park. The Honda matched the description of the vehicle used in the shooting.

The officers drove past the Honda, made a U-turn, and pulled in behind it. A number of police officers arrived at the location. They had the Honda's two occupants, Vides and Martinez, two male Hispanics, step out. The officers initiated a "felony stop," handcuffing appellants, and placing them into separate, locked patrol cars.

While standing outside at the Honda, waiting for the arrival of the victim, Rodriguez, for a field showup, Officer Espinoza observed what he believed to be a cover for an apparent secret compartment in the Honda's console. The cover was ajar. Officer Espinosa brought his observations to Officer Trugman's attention. Officer Trugman also looked inside the front seat area of the Honda. He saw a "dislodged part" of the vehicle between the floorboard and "the compartment." Officer Espinoza entered the Honda, checked the compartment and removed a steel revolver with a wooden handle from the compartment. The cover to the compartment had been ajar and in plain view, but the handgun was not visible to the officers until it was removed from the compartment.

During the detention, the officers ascertained Vides had parked the Honda in front of Martinez's residence.

5

2. *The descriptions in the possession of Officer Trugman and his reasons for the detention and the search.*

During the hearing on the motion, Officer Trugman was asked to provide the descriptions he had of the vehicle and the suspects prior to the detention. Trial counsel objected the question called for hearsay, and the objection was overruled. A few questions later, trial counsel explained that he was invoking the *Harvey-Madden* rule, which required a further foundation. Trial counsel argued the questions calling for the suspect descriptions constituted hearsay in the absence of the prosecution having "verif[ied] the source of the information given to this" police officer. The trial court overruled the objections, stating, "I believe the foundation has been laid."

Officer Trugman testified that before stopping the Honda, he had received the following description of the vehicle: a "dark-color[ed] [two-door] Honda with chrome rims and unique to the vehicle . . . [was] an intake system on the front of the vehicle on hood." The suspects were described as "[t]wo male Hispanics." The officer had initiated a felony stop because he believed that, based on the radio call he had received during his prior shift and the most recent 11:15 p.m. radio call, he had detained the suspects involved in the Rodriguez shooting.

Officer Trugman admitted that the description of the air scoop on the Honda's hood was not contained in the suspect descriptions broadcast over the radio. However, he explained that the commencement of his current shift, during roll call that afternoon, the specifics concerning the shooting were shared by the responding officers with the other patrol officers. The responding officers, Officers Clayton and Carrillo, also informed Officer Trugman that the Honda had a unique after-market air scoop or air intake duct on its hood.

Apart from the similarity to the descriptions of the shooting suspects, Officer Trugman said he also regarded the driver's conduct before parking on Rampart Boulevard as odd. He said he had concluded that turning off the Honda's lights and then pulling to the curb was "unusual as a matter of driving safety and the laws of the Vehicle Code."

Additionally, the officer said that during his 10 years of experience as a police officer, he had previously encountered hidden compartments in vehicles. Such compartments were used to hide firearms and other contraband. When he made the observation of the "dislodged part of the vehicle" between the floorboard and "the compartment," he believed he was observing a hidden compartment.

During cross-examination, Officer Trugman was more specific about the timing and content of the information he received about the shooting. He said during the 12:42 a.m. radio call, he was told there was a "ADW" in which the officers, in their discussion with the victim, were told that two Hispanics had been tagging "M.S." (the initials representing the Mara Salvatrucha criminal street gang) on a building next to the victim's residence.

Trial counsel showed the officer the paper printouts containing the content of the two radio calls. The initial 12:42 a.m. radio call included the information the shooting was committed by two male Hispanics, 20 years old, in a black Honda two door, who were armed with a gun. It also said the suspects were "suspected M.S. gang members." The subsequent 23:16 hours radio call, broadcast just prior to the stop, said: "415 gang activity. Suspect vehicle described as a two-door blue Honda Civic with chrome rims."

Trial counsel pointed out there was no information in the radio calls concerning the unique air scoop. Officer Trugman again explained that at the 3:30 p.m. roll call, he had read the police reports prepared by the responding officers, which contained that information. And, at the 3:30 p.m. roll call, he spoke to Officers Clayton and Carrillo concerning the shooting, and they mentioned the air scoop. Officer Trugman acknowledged there was no reference

7

to the air intake vent in Officers Clayton's and Officer Carrillo's initial police report concerning the incident. But Officer Trugman replied that in the 23:40 hours December 12, 2011, investigative statement report there was a reference to the air intake scoop. He then acknowledged that the latter report was filed a half hour after Officer Trugman had initiated the felony stop.

3. *The issues raised by counsel in argument.*

The prosecutor argued reasonable cause for the detention and that the officers had probable cause to search the Honda for evidence of the shooting, especially in light of the officers' observations of the apparent hidden compartment in the Honda's cab.

Trial counsel argued the descriptions of the vehicle and suspects were too vague and generic to amount to reasonable and probable cause. The air scoop, which the prosecution claimed was a unique after-market item, was not mentioned in any of the officers' communications or reports until after the detention was initiated. Martinez's trial counsel urged Officer Trugman's testimony should be stricken because the prosecutor had failed to call Officers Clayton and Carrillo "to come and testify" to the source of the probable cause. The defense thus was prevented from testing the credibility of, and from confronting, these source officers.

4. *The trial court's ruling.*

The trial court said the primary issue in the case was the validity of the automobile search. It ruled there was reasonable cause for the brief detention pending a victim identification. When Officers Trugman and Espinoza saw the apparent hidden compartment inside the front seat area of the vehicle, they had probable cause to believe the gun used in the shooting was inside the Honda, and the automobile exception to the requirement of a warrant applied to the officers' search. It denied the motion to suppress without commenting on the *Harvey-Madden* issue.

8

**DISCUSSION**

1. *The standard of review.*

The standard of review for the denial of a motion to suppress is well settled. "We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362; *People v. Leyba* (1981) 29 Cal.3d 591, 596-597, fn. omitted.)

"There is, of course, no requirement that a trial court's ruling on a suppression motion be accompanied by 'findings' or even a statement of the court's inference from the evidence, views as to the applicable law, or reasons for its ruling. [Citations.]" (*People v. Manning* (1973) 33 Cal.App.3d 586, 559-600 (*Manning*).) "Generally, the ruling of a trial court upon a motion implies a finding of fact favorable to the prevailing party on each ground or theory underlying the motion. [Citation.] The implication applies specifically to rulings admitting or excluding evidence. [Citations.]" (*Id.* at pp. 601-602.)

2. *The applicable legal principles.*

" 'An otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.' (*Whiteley v. Warden* (1971) 401 U.S. 560, 568.) '[W]hile it may be perfectly reasonable for officers in the field to make arrests on the basis of information furnished to them by other officers, "when it comes to justifying the total police activity in a court, the People must prove that the source of the information is something other than the imagination of an officer who does not become a witness." ' (*Remers v. Superior Court* [(1970)] 2 Cal.3d 659, 666 [(*Remers*)], quoting *People v. Adkins* (1969) 273 Cal.App.2d 196, 198.) 'To hold otherwise would permit the manufacture of reasonable grounds for arrest within a police department by one officer transmitting information purportedly known by him to another officer who did not know such information, without establishing under

9

oath how the information had in fact been obtained by the former officer.'
(*Remers, supra*, at pp. 666-667.) '[W]hen an officer furnishes to another officer information which leads to an arrest, the People must show the basis for the former officer's information.' (*Id*. at p. 667.)" (*In re Eskiel S.* (1993) 15 Cal.App.4th 1638, 1642-1643 (*Eskiel S.*); see also *People v. Ramirez* (1983) 34 Cal.3d 541, 551 [recently affirming the validity of the *Harvey-Madden* rule in the context of an arrest made on the basis of a recalled warrant].)

The *Harvey-Madden* rule also applies to establishing reasonable cause for a detention. (*Ojeda v. Superior Court* (1970) 12 Cal.App.3d 909, 920.)

3. *The analysis.*

In this contention, appellants concede they are not disputing the legality of the detention or the search. (See *Arizona v. Gant* (2009) 556 U.S. 332, 346-347; *United States v. Ross* (1982) 456 U.S. 798, 820-821 [under the automobile exception, police who have probable cause to believe a lawfully stopped vehicle contains evidence of criminal activity or contraband may conduct a warrantless search of any area of the vehicle in which the evidence might be found].) Appellants' sole contention on appeal concerns whether the *Harvey-Madden* rule applies to require the prosecution to call Officers Clayton and Carrillo as witnesses at the hearing to testify as to the source of their information concerning the description of the suspects and the suspects' vehicle. This court concludes the prosecution substantially complied with the *Harvey-Madden* rule.

At the outset, appellants' comments in briefing urge that the trial court made no ruling on his *Harvey-Madden* objections. However, the trial court overruled both objections raised by appellants. And by denying the search and seizure motion, it made an implied ruling against appellants concerning the *Harvey-Madden* rule. (*Manning, supra*, 33 Cal.App.3d at pp. 599-602.)

10

It is apparent from the evidence adduced at the hearing that the source of the information relied on by Officer Trugman was a known citizen victim. At the hearing, appellants had the trial court consider the police reports prepared concerning the shooting. We assume that the police reports contained information regarding how Rodriguez had telephoned 9-1-1 on both occasions, once with his description of the suspects and their vehicle, and the content of his statements to the police on the early morning of the shooting.[3] Further, at the hearing, Officer Trugman mentioned in his testimony that he was aware that the source of Officers Clayton's and Carrillo's information concerning the suspect and the Honda was the victim of the "ADW." Specifically, Officer Trugman testified that the 12:42 a.m. radio call informed him that an "ADW" had occurred in which "the officers, in their discussion with the victim," were advised that the victim had seen "two male Hispanics tagging M.S. on a . . . building . . . ."

Thus, it was established at the hearing that the information relied upon by Officer Trugman arose from a known and reliable source, a crime victim and had originated outside of police channels. In these circumstances, there was no possibility that the officers had manufactured reasonable or probable cause by use of official channels. "When the judiciary can reasonably determine that no evidence has been manufactured, there is no reason for strict compliance with the letter of the '*Harvey-Madden*' rule." (*In re Richard G.* (2009) 173 Cal.App.4th 1252, 1260.) Accordingly, the prosecutor was not required in this instance to call the two responding police officers as witnesses at the hearing. (Accord, *People v. Johnson* (1987) 189 Cal.App.3d 1315, 1320 [the trial "court did not violate the

---

[3] This court was unable to review the police reports prepared by Officers Clayton and Carrillo concerning the victim and the victim's description of the suspect vehicle and his assailants. The record demonstrates the police reports referred to during testimony and identified by reference as exhibits C and D were not entered into evidence at the end of the hearing. After being identified, they were returned to the respective parties who produced them at the hearing. The parties did not seek to augment the appellate record with the police reports.

*Harvey-Remers* rule in relying on circumstantial evidence proving that the information transmitted to the officers must have come from some source outside the police department"]; *People v. Orozco* (1981) 114 Cal.App.3d 435, 444 (*Orozco*) ["The whole point of the *Remers* rule is to negate the possibility that the facts which validate the conduct of the officers in the field are made up inside of the police department by somebody who is trying to frame a person whom he wants investigated."] .) Moreover, the descriptions of the suspects and Honda were in part corroborated when the officers discovered a revolver in the hidden compartment in the Honda. (*Orozco, supra*, at pp. 444-445 [original anonymous telephone call of shooting corroborated by the detaining officer finding spent cartridges at the scene of the detention].)

To the extent that the decision in *Eskiel S., supra*, 15 Cal.App.4th 1638 requires strict compliance with the *Harvey-Madden* rule, we disagree with that decision. [4]

---

[4] We note the trial court, the prosecutor and trial counsel were well aware that Rodriguez was the source of the descriptions of the suspects and the suspect vehicle. They had just addressed the defense section 995 motion some six days before the motion to suppress. In the course of the section 995 motion, the same bench officer read and considered the preliminary hearing transcript. At the preliminary hearing, the victim, Rodriguez, had testified to the content of his two 9-1-1 calls and to speaking to the responding officers and giving them his descriptions of the shooting suspects and the Honda with its unique air scoop. Rodriguez also testified he had mentioned the Honda's air scoop during the latter of his 9-1-1 calls. Rodriguez's testimony would have been adequate to satisfy the *Harvey-Madden* rule had it been introduced into evidence at the suppression hearing. (See *Whiteley v. Warden, supra*, 401 U.S. at pp. 564-565, 567-568.)

## DISPOSITION

The judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                    KLEIN, P. J.


We concur:



KITCHING, J.



ALDRICH, J.

13