[Crim. No. 19363. First Dist., Div. Four. Apr. 29, 1980.]

**THE PEOPLE, Plaintiff and Respondent, v.
IRVIN DEWAYNE HARRIS, Defendant and Appellant.**

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Deborah Long, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, William D. Stein and John W. Runde, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CALDECOTT, P. J.—Appellant Irvin Dewayne Harris was convicted, following a jury trial, of burglary, second degree and grand theft. The appeal is from the judgment. Prior to trial appellant's motion to suppress evidence, made pursuant to Penal Code section 1538.5, was denied and appellant admitted a prior conviction of receiving stolen property, a violation of Penal Code section 496. Appellant was sentenced to state prison for the median term of two years on the burglary conviction. Imposition of sentence on the grand theft conviction was stayed pending finality of the conviction of burglary. Appellant was given 126 days credit for time served.

On July 20, 1978, at approximately 10:30 p.m., Officer Ralph Weiss received a report of an alarm at Capwell's department store in the El Cerrito Plaza Shopping Center. Upon arriving at the scene, the officers checked the perimeter of the store and found it locked and intact. Officer Weiss called up the store manager, Robert Renko, so that they could enter and check the inside of the store together. On entering the store, the manager informed the officer that the interior rather than the exterior alarm had sounded. Suspecting that the burglary was still in progress they immediately left the store and Officer Weiss broadcast for additional cover. The broadcast was answered by Officer Dennis Cook, who reported that he had just observed someone run from the store through the mall. After exiting the store, Officer Weiss discovered that a large glass window on the north side of the building was broken and that a suitcase stuffed with Capwell's merchandise was lying in the mall nearby.

Officer Cook testified that he received a broadcast of the Capwell's burglary at approximately 11 p.m. Cook remained in his patrol unit and took up a position in the northwest parking lot, observing the north side of the building. Shortly after arriving, as the headlights of his vehicle illuminated the building, Officer Cook observed a man running from the building southbound through the mall. The man dropped a suitcase and fled south. Officer Cook immediately broadcast that he had a suspect in view and "directed another patrol unit to get to the south side of the plaza to seal him off." Momentarily, Cook saw the man return running back northbound in his direction. He pursued the suspect in his patrol car closing to within seven to ten feet of the suspect. The man looked over his shoulder at the patrol car and his face was brightly illuminated by the headlights of the vehicle. As appellant approached the gateway to an adjacent medical building, Officer Cook got out of the patrol car, drew his weapon and directed appellant to stop. Appellant spun around with his hands in the air, then darted down a flight of stairs. Cook took a "very good look" at the suspect and identified him as appellant at trial.

The next policeman, Officer Mark Woltering, who was patrolling the area of the burglary, testified that about 11:30 p.m., he received a report that the suspect was in the vicinity of a medical building located on Fairmount. He left the patrol car and spotted a black female standing on the corner of Lexington and Fairmount. He asked the woman if she saw a black man running through the plaza, and she responded that she observed a man running down Lexington in a northerly direction. Officer Woltering began to search the area on the east side of Lexington. Meanwhile, the woman was "walking very slowly, looking about, seeing what. . .[the officer] was doing." Approximately 10 minutes later, Officer Woltering observed a black male approaching him from the southerly direction on Lexington. The man was walking at a rapid pace and was breathing heavily. When Woltering walked out from between the houses, the man broke into a run, darting inside the yard of a house across the street. Officer Woltering shouted for him to stop, then went after him. After a chase, he was joined by Officer Maehler and together the officers succeeded in apprehending the man in the yard of a residence. At trial, Officer Woltering identified the suspect as appellant.

The store manager Renko reentered the Capwell's building to determine whether anything was out of the ordinary inside. Inside the store,

Renko observed that several pieces of luggage were lying on the floor next to the womens' fur case on the first floor. Furthermore, he discovered that several of the display cases in the jewelry department were broken, and that approximately $16,000 worth of items had been taken. Additionally, he ascertained that certain items of infant clothing along with one piece of luggage had been stolen.

In the early morning hours of July 21, 1978, Lieutenant William Edmunds of the El Cerrito Police Department observed the booking of appellant at the El Cerrito police station. During the booking process, appellant asserted that his name was "Wayne Jackson." At the time of booking, appellant's shoes were seized as evidence. Lt. Edmunds also participated in the booking of the woman, Sharon Devlin, whom Officer Woltering had spoken with at the intersection of Fairmount and Lexington Streets and who subsequently had been taken into custody. At the time of the booking, Devlin's purse was searched. Inside the purse a wallet was found with a driver's license and other identification indicating that it belonged to appellant Irvin Harris. Additionally, inside the wallet ostensibly belonging to appellant, was the photograph of an infant child with an inscription on the back reading, "To Sharon and Dewayne." Furthermore, a key to room 10 at the Capri Motel in Berkeley was found, which was the address given by appellant as his residence at the time of booking.

After appellant's apprehension, his shoes were delivered to a criminalist, John Patty, to examine for the presence of "trace evidence." Patty examined the fragments microscopically and compared them with shards of glass taken from the broken window at Capwell's. Examination revealed that the two samples had the identical refractive index and the identical density. Patty noted that approximately 8,000 different densities of glass were in existence and that the glass taken from the shoes was indistinguishable in any respect from that used by Capwell's.

Appellant presented an alibi defense at trial supported mainly by his own testimony. He stated inter alia that on July 20, 1978, the day of the burglary, he and Sharon Devlin, his girlfriend, resided at the Capri Motel in Berkeley. He and Ms. Devlin, together with her pet poodle, left the motel that night and traveled on BART to the El Cerrito station, arriving at about 9:30. Their intention was to go bowling. On the BART platform at El Cerrito, however, the two began to argue and appellant left Ms. Devlin standing there. Nevertheless, just after the

BART train had arrived at the El Cerrito station, appellant gave Ms. Devlin his wallet to take care of for him. He did so (allegedly) because he had an outstanding traffic warrant and he was afraid that if stopped he might be arrested on the warrant were he to be identified.

After the "argument" appellant caught a bus back to Berkeley and went to the motel. He remained in the motel for about 20 minutes, then took a San Pablo bus and returned to El Cerrito. He got off the bus near Lexington Street in El Cerrito and noticed several police cars cruising on Fairmount and Lexington. When one of the officers approached him, appellant decided to flee because he was frightened about the prospect of being taken into custody on the traffic warrant. He was apprehended and arrested after a brief chase. Appellant denied that he had been to the El Cerrito Capwell's store that day and specifically that he had burglarized the store that evening.

On cross-examination appellant admitted, however, that he had given various false statements to the police; that he and Ms. Devlin had been to the Capwell's store several days before and that at that time she had tried on one of the mink coats; and that at the time of the crimes, Ms. Devlin was pregnant with his child. Moreover, he was evasive as to why he gave his wallet to Ms. Devlin while in the middle of an argument on the BART platform.

## I

### The Search of Ms. Devlin's Purse

Appellant's principal contention on appeal is that the trial court committed prejudicial error by denying his motion to suppress the evidentiary items seized from Ms. Devlin's purse during the booking procedure. More specifically, appellant claims that the seizure in question was unlawful on two grounds: (a) that Ms. Devlin's antecedent arrest was unlawful because it was not based upon probable cause; (b) aside from the legality of the arrest, the warrantless search of the purse was impermissible under *United States* v. *Chadwick* (1977) 433 U.S. 1 [53 L.Ed.2d 538, 97 S.Ct. 2476], and its progeny, especially *United States* v. *Schleis* (8th Cir. 1978) 582 F.2d 1166, and *People* v. *Pace* (1979) 92 Cal.App.3d 199 [154 Cal.Rptr. 811]. As we shall explain below, both of these arguments are meritless and must fail.

### (a)  *Ms. Devlin's Arrest*

It is, of course, well established that a peace officer may arrest a person without a warrant whenever he has reasonable cause to believe that the person to be arrested has committed a felony (Pen. Code, § 836, subd. 3). ■ Reasonable or probable cause to arrest exists if the facts and circumstances known to the arresting officers would cause a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that an offense has been committed and the accused is guilty thereof. (*People* v. *Martin* (1973) 9 Cal.3d 687, 692 [108 Cal.Rptr. 809, 511 P.2d 1161]; *People* v. *Gomez* (1976) 63 Cal.App.3d 328, 333 [133 Cal.Rptr. 731]; *People* v. *Lurie* (1967) 257 Cal.App.2d 98, 100 [64 Cal.Rptr. 637].) While no exact formula exists for determining probable cause and each case must be decided on the facts and circumstances presented to the officers at the time they were requested to act (*People* v. *Ingle* (1960) 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577]; *People* v. *Ferguson* (1963) 214 Cal. App.2d 772, 775 [29 Cal.Rptr. 691]), it has been held that in order to justify a warrantless arrest the officer must be able to point to specific and articulable facts which reasonably warrant his suspicion that an offense has been or is being committed. (*People* v. *Superior Court* (*Johnson*) (1971) 15 Cal.App.3d 146, 151 [92 Cal.Rptr. 916]; *People* v. *Martin, supra*, 9 Cal.3d 687 at p. 692.) We believe when viewed in light of the aforegoing principles the instant record contains sufficient facts to sustain the detention, questioning and ensuing arrest of Ms. Devlin and as a consequence the trial court's finding of probable cause must be upheld.

The evidence demonstrating probable cause is set forth in the transcript of the suppression hearing conducted on January 11 and 12, 1979, at which both Officer Woltering and Officer Maehler provided extensive testimony with regard to the circumstances leading to Ms. Devlin's arrest.

Consistent with his trial testimony, Officer Woltering testified at the preliminary hearing that at approximately 11:30 on the night of July 20, 1978, he received a broadcast of a burglary at Capwell's at the El Cerrito Plaza. The suspect was reported to have run from the shopping center lot to the adjacent medical building located at Fairmount and Lexington Streets. When Woltering and his partner arrived at the intersection roughly one minute after receiving the broadcast, they saw a woman (later identified as Ms. Devlin) standing on the corner with a

small dog. But for Ms. Devlin, the street was deserted. Woltering asked Ms. Devlin if she had just seen the fleeing suspect. Ms. Devlin gave a false reply to the officer by informing him that she had seen the suspect run *northbound* on Lexington Street. In fact, the opposite was true and after a short area search the officers discovered that the suspect was approaching from the *southerly* direction. Officer Woltering also observed that during their search of the area, Ms. Devlin acted suspiciously, walking slowly and scrutinizing the movements of the officers. After appellant was arrested, Woltering advised the arresting policeman, Officer Maehler, that Ms. Devlin had given him false information regarding appellant's flight and that from her curious movements on the street, monitoring his investigation, she appeared to be a suspicious character.

Officer Maehler, the other officer testifying at the suppression hearing, stated that on the night of the burglary he operated near the intersection of Fairmount and Lexington and that he too, observed Ms. Devlin walking in the same general area. After appellant's arrest he was told by Officer Woltering that Ms. Devlin had given false information as to the direction the suspect was fleeing. With this knowledge in mind, Officer Maehler approached Ms. Devlin and requested some identification. Ms. Devlin responded that she had none and informed him that her name was "Lynn Jackson." He next asked for her address and she replied that it was 2833 Chancellor Street in Richmond, a location approximately five or six miles away.

Wondering what the woman was doing walking her dog at midnight five or six miles away from her home, Maehler inquired what she was doing in the area. She stated that she had taken BART to El Cerrito Plaza station and that she was waiting for a friend who was arriving from San Jose on BART. Believing her story to be incredible (because BART does not run to San Jose; because dogs are not allowed through the BART turn-stiles; and because when stopped she was walking *away* from the station) Maehler then asked what the name of her friend was and how she got the dog onto the train. When the woman could not come up with the name of the alleged friend she was waiting for in the middle of the night in an area where a burglary was reported, Maehler informed her that unless she could provide some identification, she would be taken into custody. She then pulled out a California driver's license which indicated a completely different name and a Salinas address. Taking into account all the circumstances, including the fact that a burglary had been committed and that among the items stolen were

baby clothes, Maehler placed Ms. Devlin under arrest for investigation of burglary.

■ We conclude that the evidence set out above provided probable cause for Ms. Devlin's arrest on two separate grounds. One, in the situation presented Officer Maehler was justified in his belief that Ms. Devlin had *knowingly* given Officer Woltering false information so as to facilitate appellant's escape from arrest. Such conduct on the part of Ms. Devlin constituted a felony, accessory after the fact in violation of section 32 of the Penal Code.[1] Two, the officer was justified in believing that Ms. Devlin was involved also in the commission of the underlying burglary. Her presence and suspicious movements on the deserted street in the middle of the night; her untruthful answers to the officer's questions; and her active assistance of appellant's escape efforts, all pointed to the probability that she was acting in concert with appellant. Under these circumstances the officer was justified in taking Ms. Devlin into custody for the purpose of ascertaining her real identity and her likely connection with the already arrested perpetrator.

### (b) *The Booking Search*

Appellant next contends that even if Ms. Devlin's arrest was lawful, the booking search of her purse at the police station was illegal without a search warrant and as a consequence certain evidentiary objects found in the purse were inadmissible in evidence. Appellant's contention may not be accepted for a variety of reasons.

■ It is well established principle deeply ingrained in our criminal law that an arrested person and his belongings may be searched without a warrant both as incident to the arrest (*Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034]) and/or as incident to the booking procedure (*People* v. *Munsey* (1971) 18 Cal.App.3d 440, 448 [95 Cal.Rptr. 811]; *People* v. *Superior Court (Fuller)* (1971) 14 Cal.App.3d 935, 945 [92 Cal.Rptr. 545]; *People* v. *Tennessee* (1970) 4 Cal.App.3d 788, 792 [84 Cal.Rptr. 697]; *People* v. *Lurie, supra,* 257 Cal.App.2d 98, 103). ■ As our Supreme Court put it in *People* v. *Ross* (1967) 67 Cal.2d 64, 70 [60 Cal.Rptr. 254, 429 P.2d 606], re-

---

[1]Section 32 provides that: "*Every person who, after a felony has been committed,* harbors, conceals or *aids a principal* in such felony, *with the intent that said principal may avoid or escape from arrest,* trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, *is an accessory to such felony.*" (Italics added.)

versed on other grounds *sub nom. Ross* v. *California* (1968) 391 U.S. 470 [20 L.Ed.2d 750, 88 S.Ct. 1850]: "A search of an arrested person at the time of his booking has always been considered contemporaneous to his arrest and is a reasonable search. His personal effects may be removed from him; the police may examine them to see if they have been stolen, return them to the prisoner on his release, or preserve them for use as evidence at the time of trial." This widely accepted principle is rooted not only in the common law which recognized that a person being processed for incarceration would be searched, but also in the express mandate of the statute. Penal Code section 1412 provides in part that when "money or other property" is taken from an arrested defendant the officer taking it must give receipt therefor. As the court observed in *Ross*: "This statutory requirement necessarily assumes that 'money or other property' may be lawfully seized from one arrested for a crime." (*Id.*, at p. 70.) Government Code section 26640 likewise sets forth in part that: "The sheriff shall take charge of, safely keep, and keep a correct account of, all money and valuables found on each prisoner when delivered at the county jail." This section codifies the long-established right to search a prisoner when he is booked at the police station in order to prevent weapons and contraband from being brought into the jail and to remove his personal effects from him. (*People* v. *Rogers* (1966) 241 Cal.App.2d 384, 389 [50 Cal.Rptr. 559]; *People* v. *Munsey, supra*, 18 Cal.App.3d at p. 448). ■ Since Ms. Devlin's purse in the case at bench was concededly searched at the police station as a part of the routine booking proceeding, the case falls squarely within the aforetested rules and appellant's claim of illegality must be rejected for this reason alone.

Appellant's reliance on *United States* v. *Chadwick, supra*, 433 U.S. 1, and the case authorities decided thereunder, is obviously misplaced. In *Chadwick*, the United States Supreme Court held only that the warrantless search of a double-locked footlocker which had been taken from the defendant's car and placed in a distinct building, was not justified under the automobile exception rule because it was not incident to an automobile search; was under the exclusive control of the federal agents; and there was no danger whatever that it or its contents could be removed before a valid search warrant could be obtained. The court also held that the search of the footlocker was not warranted as incident to an arrest either because the search was remote in time or place or no exigency existed, the search having been conducted more than an hour after the federal agents had gained exclusive control of the footlocker and long after the defendants were securely in custody. The

Supreme Court, however, left no doubt that its holding in *Chadwick* did not alter the existing exceptions to a warrantless search, especially the search incident to an arrest. Thus, significantly enough, the Supreme Court had the following to say: "When a custodial arrest is made, there is always some danger that the person arrested may seek to use a weapon, or that evidence may be concealed or destroyed. To safeguard himself and others, and to prevent the loss of evidence, it has been held reasonable for the arresting officer to conduct a prompt, warrantless 'search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.' *Chimel* v. *California*, 395 U.S., at 763. See also *Terry* v. *Ohio*, 392 U.S. 1 (1968).

"Such searches may be conducted without a warrant, and they may also be made whether or not there is probable cause to believe that the person arrested may have a weapon or is about to destroy evidence. The potential dangers lurking in all custodial arrests make warrantless searches of items within the 'immediate control' area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved. *United States* v. *Robinson*, 414 U.S. 218 (1973); *Terry* v. *Ohio, supra.* However, warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the 'search is remote in time or place from the arrest,' *Preston* v. *United States*, 376 U.S., at 367, or no exigency exists." (*United States* v. *Chadwick, supra*, 433 U.S. at pp. 14-15 [53 L.Ed.2d at pp. 550-551].)

The proposition that *Chadwick* left the well-established exceptions to the warrant requirement intact, gained further support in *United States* v. *Schleis, supra*, 582 F.2d 1166, where the federal Court of Appeals stated inter alia that "[t]he Fourth Amendment warrant clause has long been subject 'to a few specifically established and well-delineated exceptions.' *Katz* v. *United States*, 389 U.S. 347, . . . (1967). *We do not read the Court's decision in* Chadwick *as representing a departure from such a long-standing approach. Indeed, the Court in* Chadwick *recognized and reaffirmed both the* Edwards [*United States* v. *Edwards* (1974) 415 U.S. 800, 39 L.Ed.2d 771, 94 S.Ct. 1234] *and the* Chimel *exceptions to the warrant requirement.*" (*Schleis*, at p. 1171; italics added.)

Appellant's additional argument that the booking search of Ms. Devlin's purse at the police station was invalid without a search warrant

because the purse was seized at the time of her arrest, was placed in the exclusive custody of the police and the search was remote in time and place and no exigency existed (*United States* v. *Chadwick, supra,* 433 U.S. 1; *People* v. *Pace, supra,* 92 Cal.App.3d 199) is also unmeritorious and must be rejected on several grounds.

One, as mentioned earlier and further discussed below, *Chadwick* centered upon, and its holding was limited to, personal property *not* immediately associated with the person of the arrestee, rather than a woman's purse which under California law is considered a normal extension of a person subject to search. (*People* v. *Flores* (1979) 100 Cal.App.3d 221, 230 [160 Cal.Rptr. 839]; *People* v. *Edwards* (1971) 22 Cal.App.3d 598, 602 [99 Cal.Rptr. 516].) As a consequence, *Chadwick* is inapplicable to the present instance as a matter of law. The case at bench falls rather within *People* v. *Belvin* (1969) 275 Cal.App.2d 955 [80 Cal.Rptr. 382] and cases following *Belvin.* In *Belvin,* the officers went to the address of the defendant, a parole violator. They arrested her in her bedroom and took her for security reasons to the living room. In the meanwhile her purse, which was left on the floor of the bedroom, was searched by one of the officers in the bedroom. The search yielded several rolls of coins and two balloons of heroin in the zippered compartment of the purse. In upholding the validity of the search as incident to a lawful arrest, the *Belvin* court reasoned that an arrestee's personal articles such as a purse, wallet or coat actually in use, though not necessarily on his person at the moment of the arrest, serve as possible sources of concealed weapons and of evidentiary items. Their search thus serves the dual function of security and legitimate investigation. Based upon the above rationale the court concluded that "defendant's purse, apparently in use by her at the time of her arrest, legally amounted to an extension of her person and could be searched on her arrest. Whether the search of the purse took place before or after defendant's physical removal to another room we consider wholly fortuitous." (*People* v. *Belvin, supra,* 275 Cal.App.2d at p. 959; accord: *People* v. *Flores, supra,* 100 Cal.App.3d at p. 230.) By analogy, we hold that since the purse carried by Ms. Devlin at the time of her arrest is to be regarded as an extension of her person for the purposes of search, and since the person of an arrestee can be searched without a warrant either on the place of the arrest or at the police station, it is immaterial whether the search of Ms. Devlin's purse was effected at the place of her arrest or shortly after at the police station.

Two, it bears special emphasis that Ms. Devlin's purse was searched as an integral part of the booking process. As pointed out earlier, the

booking search has manifold justification, including the inventory of the arrestee's property. The traditional right of the police to search the arrestee's property during the booking procedure has been recently reaffirmed by *People* v. *Maher* (1976) 17 Cal.3d 196, 200-201 [130 Cal.Rptr. 508, 550 P.2d 1044], where our Supreme Court stated as follows: "Traditionally it was recognized that a person being processed for incarceration could be searched. The purpose was threefold: to maintain jail security, to discover evidence pertaining to the crime charged, and to safeguard the prisoner's personal belongings. *At common law the search was not necessarily related to the right to search incident to arrest, but was considered a lawful and customary jail detention routine.* (Gardner & Manian, Principles and Cases of the Law of Arrest, Search, and Seizure (1974) p. 200.) *Courts today still employ the same rationale in upholding these searches, citing the need to provide for the safety of police personnel and other prisoners, to prevent the introduction of weapons and contraband into the jail, and to inventory the entering prisoner's property.*" (Italics added.)

Three, *People* v. *Pace, supra,* 92 Cal.App.3d 199, one of the main authorities cited by appellant, is not controlling in the case at hand for two major reasons. First, *Pace* is factually distinguishable from the case at bench. It involved an "on the spot" search of a lunchbox. By contrast, the present case deals with the entirely distinct issue of a booking search conducted at the police station. As noted before, the booking search has the additional objectives of preventing the introduction of weapons and contraband into the jail and of making an inventory of the prisoner's personal property in accordance with the specific mandate of the statute, issues not involved in either *Chadwick* or *Pace.*

Secondly, inasmuch as *Pace* could be interpreted as authority to abolish a certain type of warrantless search [i.e., search of containers incident to an arrest], we believe *Pace* does not properly reflect the applicable law.

To begin with, it is to be noted that while apparently predicated on *Chadwick, Pace* goes beyond that case and arrives at a conclusion which is not justified under *Chadwick.* As indicated earlier, *Chadwick* makes it clear that it does not intend to alter the well established exceptions to the warrant requirement, especially the search incident to an arrest which has been repeatedly upheld by an unbroken line of cases [see discussion, *ante*]. While *Chadwick* concludes that when luggage or other personal property of the suspect is reduced to the exclusive

control of the law enforcement officers, the search of such items is no longer incident to the arrest, *Chadwick* makes it unquestionable that the narrow exception thus defined applies only to items not immediately associated with the person of the arrestee. The precise language in question reads as follows: "Once law enforcement officers have reduced *luggage or other personal property not immediately associated with the person of the arrestee* to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest." (*United States v. Chadwick, supra,* 433 U.S. at p. 15 [53 L.Ed.2d at p. 551], italics added.)

Moreover, as eloquently stated in *Flores,* "although the *Pace* court recognizes the continuing viability of the *Chimel* rule governing searches incident to arrest (*id.,* at p. 207), it nevertheless fails to consider and discuss the permissible scope of searches of property *associated with the person* of the arrestee (or normal extensions) as distinguished from the 'area "within his immediate control."'" (*People v. Flores, supra,* 100 Cal.App.3d at p. 232, fn. 5.)

In view of our conclusion it is unnecessary to decide whether appellant's contention should be rejected for the additional reason that the legality of the booking search was not raised in the proceedings below and as a result the issue is not properly before us. (Cf. *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626 [108 Cal.Rptr. 585, 511 P.2d 33] with *People v. De Santiago* (1969) 71 Cal.2d 18 [76 Cal.Rptr. 809, 453 P.2d 353].)

## II

### *Prior Conviction*

■ Appellant was charged in the information with a prior conviction for receiving stolen property committed in 1976. Relying on *People v. Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1] and its progeny, appellant moved to exclude the prior conviction from evidence. After weighing the factors laid down in *Beagle* the trial court denied the motion. Appellant now claims that the denial of the motion constituted reversible error. We disagree.

In *Beagle,* our Supreme Court determined that section 788 of the Evidence Code does not embody a mandatory rule requiring the trial

judge to permit the use of such impeachment evidence in every case. Rather, the Supreme Court concluded that section 788 is subject to the exclusionary rule embodied in section 352 of the Evidence Code, which invests the trial court with wide discretion to exclude evidence if its probative value is substantially outweighed by its prejudicial effect. In helping the trial judge determine whether the probative value of a prior outweighs its potential prejudice, the court in *Beagle* set out four basic criteria, i.e., (1) whether the prior involves dishonest conduct which relates to the credibility of a person; (2) whether the prior is near or remote; (3) whether it is similar to the offense currently charged; and (4) whether the admission of the prior will deter the defendant from testifying on his own behalf. (*People v. Beagle, supra,* 6 Cal.3d at p. 453.)

Applying these elements to the instant facts, the prior conviction for receiving stolen property was a crime involving a dishonest act which bore on appellant's veracity as a witness. Moreover, the prior was not identical to the offense charged and was not remote in time. Finally, and even more significantly, the admission of the prior conviction did not deter appellant from testifying on his behalf at the trial. Since it is thus clear that the *Beagle* factors were fully satisfied and since appellant as a witness testifying in his own case is not entitled "to a false aura of veracity" (*People v. Beagle, supra,* 6 Cal.3d at p. 453), the admission of appellant's prior conviction must be held manifestly correct.

We briefly note that *People v. Fries* (1979) 24 Cal.3d 222 [155 Cal.Rptr. 194, 594 P.2d 19], a case relied upon heavily by appellant, is clearly distinguishable from the present instance. In *Fries,* the prior robbery conviction was identical with the offense for which the defendant was tried. Furthermore, for fear of impeachment the defendant in *Fries* refused to testify at the trial and as a consequence the jury was precluded from hearing the defendant's version of the case. By contrast, in the case at bench, appellant did testify at the trial and the prior conviction admitted for impeachment purposes, though containing a similar element, was not identical with the offenses for which appellant was tried. Finally, while *Fries* reiterates that offenses such as robbery and burglary are somewhat less relevant on the issue of credibility than are crimes such as perjury (*People v. Rollo* (1977) 20 Cal.3d 109, 118 [141 Cal.Rptr. 177, 569 P.2d 771]), *Fries* does not portend to diminish much less overrule the guidelines and policy considerations laid down in *Beagle.*

## III

### *CALJIC No. 2.62 Instruction*

■ Upon request of the prosecution, the trial judge instructed the jury per CALJIC No. 2.62, which permits the jury to draw inferences against the defendant from his failure to explain or deny evidence against him.[2] Appellant contends that the delivery of the instruction was improper because it (1) violated his privilege against self-incrimination (*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]); (2) unfairly singled out his testimony and, (3) was unsupported by the evidence. None of these contentions is well taken.

Appellant's precise constitutional attack has been recently rejected by the California Supreme Court in *People* v. *Saddler* (1979) 24 Cal.3d 671 [156 Cal.Rptr. 871, 597 P.2d 130], which held that CALJIC No. 2.62 neither violates the *Griffin* rule, nor improperly singles out the testimony of a criminal defendant for special consideration by the jury. Appellant's alternative argument that CALJIC No. 2.62 was not supported by evidence in the present case is not tenable either. The record is replete with instances where appellant was called upon to explain certain questions pertaining to his guilt and was not able to do so. For example, appellant failed to provide persuasive explanation why he was in the vicinity of Lexington and Fairmount Streets in El Cerrito at the time of his arrest. Moreover, appellant was unable to explain at trial how his shoes had become embedded with shards of glass identical in composition to the glass used by Capwell's in its plate-glass windows which were broken during the burglary.

---

[2]The instruction given to the jury reads as follows: "It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. Thus the decision as to whether he should testify is left to the defendant, acting with the advice and assistance of counsel. In this case, defendant has elected to and has testified as to certain facts. If you find that he failed to explain or deny any fact or facts against him which he can reasonably be expected to deny or explain because of facts within his knowledge, then you may take that failure into consideration as tending to indicate the truth of that evidence and as indicating that among the inferences that may be reasonably drawn from that those unfavorable to the defendant are the more probable. In this connection, however, it should be noted that if a defendant does not have the knowledge that he would need to deny or explain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or explain such evidence. The failure of a defendant to deny or explain evidence against him does not create a presumption of guilt or by itself warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt."

## IV

### *Good Time/Work Time Credit.*

Appellant contends that Penal Code section 4019 entitles him to credit for "good time/work time," in addition to the time already credited against his sentence pursuant to Penal Code section 2900.5, for time spent in presentence custody attributable to the charges of which he stands convicted. Subject to his showing eligibility for this credit in point of fact, he is entitled to it as a matter of law. (*People* v. *Sage* (1980) 26 Cal.3d 498 [162 Cal.Rptr. 450, 606 P.2d 757].) This conclusion requires the remand ordered below.

The judgment of conviction is affirmed. The cause is remanded to the trial court with directions to determine any additional sentencing credit to which appellant is entitled consistent with the views expressed in this opinion, to resentence him as necessary, and to modify the abstract of judgment accordingly. The court is further directed to transmit a certified copy of any modified abstract of judgment to the Department of Corrections and other appropriate authorities.

Christian, J., concurred.

**POCHÉ, J.,** Concurring and Dissenting.—I concur in the judgment and in parts III and IV of the majority opinion only.

Part I of the majority opinion holds (1) that the warrantless arrest of Ms. Devlin was justified by the specific and articulable facts known to the arresting officer at the time he took her into custody, and (2) that the subsequent warrantless search of her purse at the police station was justified as "incident to the booking procedure." It concludes that the evidence seized and used against appellant need not have been suppressed; I disagree.

In part II the majority opinion concludes that a prior conviction for receiving stolen property (Pen. Code, § 496) is not "similar" to the crimes charged: burglary (Pen. Code, § 459) and grand theft (Pen. Code, §§ 484-487, subd. 1). The opinion then applies the 1972 rules of *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], rather than the 1979 rules enunciated in *People* v. *Fries* (1979) 24 Cal.3d 222 [155 Cal.Rptr. 194, 594 P.2d 19]. To each of those determinations I dissent.

# I

*Probable Cause for Warrantless Arrest*

The Supreme Court of this state has often recited the criteria that establish probable cause for arrest without a warrant. "'Cause for arrest exists when the facts known to the arresting officer "would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime." [Citations.]'" (*People* v. *DeVaughn* (1977) 18 Cal.3d 889, 895 [135 Cal.Rptr. 786, 558 P.2d 872], citing *People* v. *Harris* (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632].) "A mere hunch or a good faith belief on the part of the arresting officer is not enough; he "'must be able to point to specific and articulable facts which...reasonably warrant"' his suspicion that an offense has been or is being committed. [Citation.] Further, an arrest and search based on events as consistent with innocent as with criminal activity are unlawful. [Citation.]" (*People* v. *Martin* (1973) 9 Cal.3d 687, 692 [108 Cal.Rptr. 809, 511 P.2d 1161].)

The majority here bases its finding of probable cause on two separate "grounds": (1) Officer Maehler was justified in his belief that Ms. Devlin had knowingly given Officer Woltering false information so as to facilitate appellant's escape from arrest, and (2) the officer was justified in believing that Ms. Devlin was involved in the commission of the underlying burglary. These "grounds" derive in turn from her "presence and suspicious movements on the deserted street in the middle of the night; her untruthful answers to the officer's questions; her active assistance of appellant's escape efforts." Even taken at face value, the conduct does not by itself constitute probable cause for believing that it indicates *commission* of a burglary. If it did, every citizen found walking a dog late at night within a radius of several blocks from a reported burglary who gives inaccurate statements to police about the movements of possible suspects in the area would be subject to arrest and search in connection with the burglary itself. Prior to her arrest, there was no evidence whatever of Devlin's participation in the burglary.

With respect to probable cause for arrest on the ground that Devlin's purpose was to "facilitate appellant's escape from arrest," scrutiny of her conduct fails to provide a basis for "an honest and strong suspicion" that she was guilty of a crime. The specific and articulable facts to

which the arresting officer was able to point at the time of the arrest were as consistent with innocent as with criminal activity.

The articulable facts actually relied on by the arresting officer consisted of her presence with a small dog on the corner of an otherwise deserted street, a reported "false reply" to a fellow officer's question about the direction of flight of a burglary suspect, her inconsistencies in explaining her presence in the neighborhood, and the disparity between the name she gave the arresting officer and the name on her driver's license.[1] Nothing more.

Ms. Devlin's presence on a deserted street with a small dog on a leash in a residential area cannot reasonably constitute probable cause for arrest and can contribute but little of cumulative effect to other facts.

The reportedly false reply about the suspect's flight made to Officer Woltering and reported by him to the arresting officer, Maehler, was that he was seen "running down north on Lexington." Under cross-examination, Officer Woltering affirmed that when he first saw the suspect, said suspect was in fact walking north in "the same direction she had then indicated." The basis for Officer Woltering's feeling that he had been given a false story was the disparity between his impression that Devlin had directed his attention "way down Lexington" and the subsequent appearance of the suspect heading north at a point less far along Lexington than he expected. He also admitted that Devlin did not say "way down Lexington," but merely that the suspect was running down Lexington. On this evidence, it cannot be reasonably maintained that a false reply to a fellow officer supports Officer Maehler's belief

---

[1]The majority opinion includes among the circumstances to be taken into account, the fact that "among the items stolen were baby clothes" and that Devlin made "curious" and "suspicious" movements. The arresting officer saw no such movements nor were anyone else's observations communicated to him. As for the stolen baby clothes, even if such loot conceivably had a more definite nexus with probable cause than through the gender of the arrestees, these items were not known to be stolen at the time of Devlin's arrest. Although Maehler testified that, "As I was responding, Officer Wise [*sic*] advised on the radio that suspect had dropped some satchels and that some of them contained watches and the other contained baby clothes," this must have been an error of hindsight. Officer Weiss did not learn the nature of the stolen items until he reentered Capwells with store manager Renko about an hour after the arrest. His broadcast, before that time, reported only "the possibility of the burglary in progress." It was Officer Cook who observed the escaping suspect drop what "appeared to be a piece of baggage or briefcase or something like that....That's all I could tell," but he did not stop to inspect it while giving chase. His broadcasts were concerned only with the description of the suspect and the latter's direction of flight.

that there was probable cause for arrest. As appellant correctly argues, even if Maehler honestly believed that Devlin had given Woltering false information, unless the basis for his belief was valid, such belief does not provide probable cause for arrest. (*Remers* v. *Superior Court* (1970) 2 Cal.3d 659, 666-667 [87 Cal.Rptr. 202, 470 P.2d 11].)

Devlin's allegedly suspicious behavior is also incapable of providing Maehler with probable cause. Officer Maehler did not see any suspicious behavior nor were Officer Woltering's suspicions communicated to him. When asked whether he had seen Devlin "do anything unusual" and whether he had seen what she was doing or where she was during the "ten to fifteen minutes" in which the officers took appellant into custody, Maehler replied, "No" to all questions.

The remaining articulable facts on which the majority opinion finds probable cause are the inconsistencies in Ms. Devlin's explanation of how she came to be in the area and in the names offered in identifying herself. She said she had taken BART from Richmond to the station in El Cerrito to meet a friend arriving from San Jose. The officer was troubled by his awareness that BART does not run to San Jose and that "only seeing-eye dogs are allowed on BART." He was dissatisfied with her explanation that "someone was taking" her friend from San Jose to a BART station from which she would ride BART to El Cerrito and that she had carried her dog onto the train in a small box. He "then advised her she was either going to come up with some identification so she could prove who she was or I was going to take her into custody." Although she had earlier given the name Lynn Devlin Jackson and said she did not have any identification, she produced a driver's license with a Salinas address in the name of Sharon Lynn Devlin. Immediately thereafter she was arrested "for investigation of 459 burglary."

If probable cause to arrest without warrant for a suspected felony exists in this conduct, I am unable to find it. If it exists here, then any reputable female citizen who "smuggles" a small dog onto BART to meet a friend for private and personal reasons which she would rather not explain to strangers, is only two steps away from arrest. If she accidently chooses to meet her friend on a deserted street near where a felony has been committed and if one of the three names she uses to introduce herself differs from the three names on her driver's license (as might well be the case for a married woman), then she may be arrested without a warrant for complicity in the felony.

Because all the facts articulable by the arresting officer at the time of the arrest are as consistent with innocence as with criminal activity, no probable cause for Devlin's arrest without a warrant existed. Accordingly, it should not be necessary to reach the question of whether evidence seized from her incident to that arrest was the result of a legal search. But even if the arrest passes constitutional muster, the search does not.

*The Legality of the Booking Search*

The Supreme Courts of the United States and of California have "repeatedly held that warrantless searches are per se unreasonable under the Fourth Amendment, subject only to a few carefully circumscribed and jealously guarded exceptions." (*People* v. *Dalton* (1979) 24 Cal.3d 850, 855 [157 Cal.Rptr. 497, 598 P.2d 467]; *People* v. *Minjares* (1979) 24 Cal.3d 410, 416 [153 Cal.Rptr. 224, 591 P.2d 514]; *Arkansas* v. *Sanders* (1979) 442 U.S. 753 [61 L.Ed.2d 235, 99 S.Ct. 2586].) If a warrantless search "is to be upheld, it is the state's burden to show that the search falls within one of those exceptions." (*People* v. *Minjares, supra,* 24 Cal.3d at p. 416.)

The majority opinion holds that a booking search is a well established exception to the prohibition against warrantless searches. It cites in support of this holding four cases of vintage as old as or older than 1971.

The opinion next rejects appellant's reliance on *United States* v. *Chadwick* (1977) 433 U.S. 1 [53 L.Ed.2d 538, 97 S.Ct. 2476], by attempting to narrow the holding to the facts in that case and to distinguish them from those in the case at bench. *Chadwick* does, nevertheless, apply. Here, as there, the container searched was one for which its owner had a reasonable expectation of privacy (a woman's purse may be even more private than a foot locker), was under the exclusive control of the police (it had been taken at the time of arrest and put on the front seat of the police car), and there was no danger that access to it might permit use of a weapon or destruction of evidence before a valid search warrant could be obtained.

The applicability of *Chadwick* to cases such as ours has been clearly asserted by the California Supreme Court in *Minjares, supra,* 24 Cal.3d 410. In that case a closed, zippered tote bag was found in the trunk of a car seized incident to the arrest of its occupants. While the defendant was in the police station, the car trunk lock was picked in the

city yard by police who thought the second suspect might be hiding therein. The Supreme Court applied *Chadwick* directly and used a case like the one at hand as an example: *"It is clear from Chadwick itself that the tote bag would not have been subject to a warrantless search if appellant had been arrested on the street and the bag taken from his possession.* The government had also contended in *Chadwick* that any property in the possession of one who is arrested is subject to a warrantless search. In rejecting this contention the Supreme Court stated that 'warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest *either* if the "search is remote in time or place from the arrest," [citation], *or no exigency exists.* Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.' (433 U.S. at p. 15 [53 L.Ed.2d at pp. 550-551], italics added; see also *United States* v. *Schleis, supra*, 582 F.2d at p. 1172.)" (*People* v. *Minjares, supra*, 24 Cal.3d at pp. 419-420; italics in first sentence added.) In our case, appellant *had* been arrested on the street, the bag *was* taken from her possession and *no exigency existed.*

In *Minjares*, the California Supreme Court repeated the compelling language of the rationale of *Chadwick*: "This is the rationale of *Chadwick*: 'Even though on this record the issuance of a warrant by a judicial officer was reasonably predictable, a line must be drawn. In our view, *when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority.*' (433 U.S. at p. 15 [53 L.Ed.2d at p. 551], italics added.) To hold otherwise would exalt the exceptions above the rule." (*Id.*, at p. 421.) It behooves this court to toe the line precisely where the warrant clause places it. As soon as Ms. Devlin's purse came under the exclusive dominion of the police, as the record shows it did, a warrant was necessary before further search could be made.

In view of the California Supreme Court's application of *Chadwick* to cases such as this, left undisturbed by the United States Supreme Court (*People* v. *Minjares* (1979) 24 Cal.3d 410 [153 Cal.Rptr. 224, 591 P.2d 514]; cert. den. (1979) 444 U.S. 887, [62 L.Ed.2d 117, 100

S.Ct. 181], it is unnecessary to review the observations by the majority on the extent to which the Court of Appeal in *People* v. *Pace* (1979) 92 Cal.App.3d 199 [154 Cal.Rptr. 811], "properly reflect[s] the applicable law."

I am acutely conscious of the conflicting results that have been wrought by diverse attempts to reconcile the prerequisites for warrantless search demanded by *Chadwick* with prior rules that *Chadwick* may or may not have displaced. One source of confusion is the ambiguity in the *Chadwick* rule: "Once law enforcement officers have reduced luggage or other personal property *not immediately associated with the person of the arrestee* to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest." (*United States* v. *Chadwick, supra*, 433 U.S. at p. 15 [53 L.Ed.2d at p. 551]; italics added.) One interpretation of this rule is that property which *is* "immediately associated with the person of the arrestee" is also immune from the prohibition against warrantless search after the arrestee's property is under the exclusive control of the police. This view underlies the majority opinion. It finds Devlin's purse immediately associated with her person and therefore not protected by the *Chadwick* rule against warrantless search.

The better interpretation of the rule is that of *Minjares* and more recent cases (cited *supra*). It looks to the *necessity* for making exceptions to Fourth Amendment guarantees against search without warrant, when exigent circumstances attend an arrest. Absent such necessity, the guarantees must predominate. That is the meaning of *Chadwick*, as reaffirmed by Mr. Chief Justice Burger who wrote the opinion. "The essence of our holding in *Chadwick* is that there is a legitimate expectation of privacy in the contents of a trunk or suitcase accompanying or being carried by a person; . . . The warrant requirement is not so onerous as to command suspension of Fourth Amendment guarantees once the receptacle involved is securely in the control of the police, . . ." (Conc. opn., *Arkansas* v. *Sanders, supra*, 442 U.S. at pp. 766-767 [61 L.Ed.2d at p. 247, 99 S.Ct. at pp. 2594-2595].)

Not only are we bound to apply the law as directed by *Minjares* and *Sanders*, but we also benefit from a formulation of the *Chadwick* rule that permits straightforward application by the police. For at least as far back as 1955, the California Supreme Court committed itself to develop rules of evidence free of "needless refinements and distinctions."

In adopting the exclusionary rule, it sought to "[open] the door to the development of workable rules governing searches and seizures and the issuance of warrants that will protect both the rights guaranteed by the constitutional provisions and the interest of society in the suppression of crime." (*People* v. *Cahan* (1955) 44 Cal.2d 434, 451 [282 P.2d 905, 50 A.L.R.2d 513].) Under the *Minjares-Sanders* mandate, an arresting officer should first try to reduce the arrestee's property to the exclusive control of the police. The property thus secured then cannot be reached by the arrestee: he cannot seize a weapon or destroy evidence. The officer need not ponder the precise degree to which the arrestee's property is "immediately associated" with his person in order to insure that evidence discovered will be admissible. If the officer also has probable cause to search the property in his control, he can obtain a warrant at his convenience.

Although the warrantless arrest and search here were illegal and constitute errors of constitutional dimension, reversal is not required unless a miscarriage of justice has resulted (Cal. Const., art. VI, § 13) or unless the court is not able to declare a belief that these errors were harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) The purse seized from Ms. Devlin contained: (1) two penlight flashlights of the type found at the scene of the burglary, (2) appellant's wallet with driver's license, and (3) the picture of an infant. Although this evidence may have served to strengthen the conclusion that appellant was guilty, I have no doubt that the same verdict would have been reached on the compelling evidence of identification by an officer who saw appellant running from the scene, of appellant's inability to provide a credible explanation of his presence or flight and of the glass fragments in his shoes that matched the glass broken in the course of the burglary.

II

*Impeachment*

Even the most casual observer of the intricate process that a trial judge must engage in to determine whether a prior conviction may be used for impeachment purposes, realizes that many appeals have gone under the bridge since the 1972 decision in *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1]. The most recent decisions from the Supreme Court in this area are *People* v. *Fries* (1979) 24

Cal.3d 222 [155 Cal.Rptr. 194, 594 P.2d 19] and *People* v. *Spearman* (1979) 25 Cal.3d 107 [157 Cal.Rptr. 883, 599 P.2d 74], which are not mere echoes of *Beagle*. Instead, they are a restatement of the rules especially with respect to how a trial judge should handle the problem of "similars." The majority here shunts *Fries* aside by limiting it to its facts: use of an *identical* prior where the defendant does not testify. If the Supreme Court viewed its *Fries* decision as a narrow one which should be limited to its facts, they picked a strange way of telling us. Throughout the majority opinion in *Fries*, continual lengthy references are made not only to identical priors but to "similars" and not only to the situation where the defendant takes the stand but where he does not. The rules enunciated in *Fries* and *Spearman* are straightforward; we are charged to enforce them. To pretend that these pronouncements do not exist or that when the Supreme Court talks in terms of "similar" priors it really doesn't mean what it says, is to create chaos at the trial level in an area of case law where lucidity is not the norm.

The *Fries* rules are: (1) "...the first factor which the trial court must evaluate is whether the prior conviction reflects adversely on an individual's honesty or veracity." (24 Cal.3d at p. 226.)

Here, the prior conviction was for receiving stolen property: "convictions for theft offenses... '...are somewhat less relevant' on the issue of credibility than are crimes such as perjury [citation] and hence are entitled to 'somewhat less' weight." (*Id.*, at p. 229.) (2) "The second factor which the trial court must evaluate in determining whether the conviction is probative of the witness' credibility is the nearness or remoteness in time of the prior conviction." (*Id.*; at p. 226.)

The prior here was two years old and therefore not remote. (3) "The trial court must weigh these two factors, which show the probative value of the conviction, against the probability that admission of such evidence 'will...create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury....' [¶] ...(*People* v. *Antick* [1975], *supra*, 15 Cal.3d at p. 97 [123 Cal.Rptr. 475, 539 P.2d 43]) which occurs when the prior convictions are admitted to impeach the credibility of a defendant who testifies, and (2) the adverse effect on the administration of justice when a defendant elects not to take the stand in order to keep information about his prior felony convictions from the jury." (*Id.*, at p. 227.)

"While the risk of undue prejudice is substantial when any prior conviction is used to impeach the credibility of a defendant-witness, it is far greater when the prior conviction is similar or identical to the crime charged. (*People* v. *Beagle, supra,* 6 Cal.3d at p. 453; *People* v. *Antick, supra,* 15 Cal.3d at p. 97; *People* v. *Rist* [1976], *supra,* 16 Cal.3d at p. 219 [127 Cal.Rptr. 457, 545 P.2d 833].) . . . [T]his court has warned that similar or identical priors should be admitted 'sparingly.' (*People* v. *Rist, supra,* 16 Cal.3d at p. 219.)" (*Id.,* at p. 230.)

The majority here ignores the last rule enunciated in *Fries* and reaffirmed as "settled principles" in *Spearman.* (*Spearman, supra,* 25 Cal.3d at p. 114.) Instead we are told that the prior offense of receiving stolen property is not similar to the offenses charged: burglary and grand theft. Not only is no explanation for that conclusion given, but the majority opinion does not confront or mention *People* v. *Banks* (1976) 62 Cal.App.3d 38, 45 [132 Cal.Rptr. 751], which finds receiving to be similar to burglary.

Based on the rules enunciated in *Fries* and *Spearman* and summarized here, the effect of the prejudice to appellant was substantially greater than the value the prior could have provided in the assessment of appellant's credibility.

It was error to find the prior similar conviction admissible. Nevertheless it is not reasonably probable that a result more favorable to appellant could have been reached in the absence of this error. (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].)

Accordingly, I concur in the judgment.

Appellant's petition for a hearing by the Supreme Court was denied June 25, 1980. Bird, C. J., Mosk, J., and Newman, J., were of the opinion that the petition should be granted.