119 Cal.Rptr.2d 839 (2002)
98 Cal.App.4th 621
The PEOPLE, Plaintiff and Respondent,
v.
Renato Salvador CELIS, Defendant and Appellant.
No. D037578.
Court of Appeal, Fourth District, Division One.
May 20, 2002.
Rehearing Denied June 6, 2002.
Review Granted August 28, 2002.
*841 Nicholas De Pento, for Defendant and Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Rhonda L. Cartwright-Ladendorf and Sabrina Y. Lane-Erwin, Deputy Attorneys General, for Plaintiff and Respondent.
HUFFMAN, J.
Renato Salvador Celis pleaded guilty to conspiracy (Pen.Code, § 182, subd. (a)(1)) and possession of cocaine for sale (Health & Saf.Code, § 11351) with the amount of cocaine exceeding 20 kilograms (Health & Saf.Code, § 11370.4, subd. (a)(4)). Before pleading guilty, Celis moved to suppress evidence under Penal Code section 1538.5. The court denied the motion to suppress items of physical evidence, but did suppress statements Celis made before he received Miranda warnings.[1] The court sentenced him to prison for 12 years. Celis appeals, contending the court erred in denying his motion to suppress evidence found inside his home and tire because it was the product of an invalid detention and arrest, an unlawful protective sweep of his *842 residence, seizure of items that were not in plain view, and an involuntary consent to search. We affirm the judgment.

FACTS
From December 1999 to January 2000, Orange County police officers began investigating a new smuggling technique in which drugs and money were placed inside large tires for transport between the Mexican border and central and Northern California. In December 1999, officers surveilled a residence in Lynwood, California. They executed a search warrant for the residence on January 7, 2000, and found $400,000 along with a tire cut open. Within the same month, officers received information connecting the Lynwood address to a residence in Bellflower. They surveilled the Bellflower address, discovered that it had been abandoned, and after obtaining the property owner's consent, searched the residence. They found a tire cut open similar to the one found at the Lynwood residence along with packaging materials.
In April 2000, police officers came to San Diego to surveil a residence located on Conception Street after receiving intelligence information that this residence may be linked to the smuggling operation from the previous Lynwood and Bellflower addresses. Officers surveilled the Conception Street residence for two days and did not observe anything indicating criminal activity. However, they traced the license plate of a parked car in the driveway to a new residence at 2641 A Street in San Diego. Officers received information from Investigator Crum that this new address on A Street was linked to their prior investigations of both the Lynwood and Bellflower residences.
Eight officers proceeded to surveil the residence at 2641 A Street. On April 26, 2000, officers saw Celis leave his house, drive to a tire store, obtain an air pressure tank from the store, and put it in his car. Next, officers watched Celis drive to the Mexican border, park his car and walk across the border with the air pressure tank still in his car. Officers ended their surveillance for that day.
On April 27, 2000, officers continued their surveillance and saw Celis take the air pressure tank from his house to his car and drive to the same tire store with another man later identified as Luis Ordaz. Celis took the air tank out of his car and brought it inside the store. While at the store, someone put a deflated tire into Celis's car. Then, Celis came out of the store with the air pressure tank and put it in his car. Celis drove back to his house on A Street and brought the deflated tire and air tank into the house. A few hours later, Celis and Ordaz went back to the tire store and brought the air tank with them. They brought the air tank inside the store and then left with the tank again and placed it back into Celis's car. Ordaz brought the tank inside Celis's house.
Forty minutes later, officers saw Celis rolling a pressurized tire out the back door of his house. Officer Strain noticed that the tire looked too large for his car. At that point, Strain detained Celis at his back door because he believed that either narcotics or money were inside the tire. Strain displayed his gun as he approached Celis because he noticed Ordaz driving a truck toward him in the alley. Strain also pointed his gun at Ordaz to get him to stop his truck. During this time, the officers did not see anybody else enter or leave Celis's house. The officers knew Celis's wife and possibly a juvenile also lived with Celis, but they did not know if anybody else was in the house.
Strain told Celis to stop after he identified himself as a police officer. Strain testified he feared Celis could be armed *843 due to the fact that he suspected drugs or money to be in the tire. Officer Betzler handcuffed Celis for officer safety purposes. Celis sat down against the wall next to his house. The officers noticed an open window near the back door and without a warrant, Officers Strain, Davis, and Betzler entered Celis's house to do a protective sweep to make sure there were not any armed people lying in wait inside.
The officers entered through an unlocked back door. Upon entering, the officers identified themselves. The house was less than 500 square feet. They entered through the kitchen first. While in the kitchen, Officer Strain noticed a large box that could hold a person. The box was partially covered by a lid with a basket on top.[2] Officers Strain and Davis at different times looked down and saw bricks of cocaine inside the box. Next, they entered the bedroom and living room area. They found nobody inside. The officers completed the protective sweep in one and a half minutes.
The officers went back outside and Strain asked Celis for consent to search his home. Celis, through a police interpreter, offered to show them where the drugs were inside the house. Celis showed officers the bricks of cocaine inside the box and money located in the house. At this point, Strain asked Celis to sign a consent to search form. Celis was hesitant at first because he was concerned for his wife. Officer Strain explained to Celis that he was not trying to coerce consent and that if Celis refused, Strain could seek a search warrant instead. Celis replied that he understood and signed the consent form. The officers seized 16 kilograms of cocaine from the house. Officer Haid shook the tire and could tell something loose was inside. The officers seized 25 kilograms of cocaine from the tire.
Meanwhile, Officers Haid and Raney detained Ordaz at his truck parked in the alley. The officers arrested both Celis and Ordaz on April 27, 2000.

DISCUSSION

STANDARD OF REVIEW
In reviewing a motion to suppress, we view the trial court's findings of fact under the deferential substantial evidence standard. Next, we apply our independent judgment to the trial court's selection of law. Finally, we review the trial court's application of law to the particular facts of the case to determine if the rule of law has been violated under the standard of independent review. (People v. Alvarez (1996) 14 Cal.4th 155, 182, 58 Cal.Rptr.2d 385, 926 P.2d 365.)

I

THE DETENTION
Celis asserts his initial detention outside his home was invalid. "[P]olice can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity `may be afoot.'" (U.S. v. Sokolow (1989) 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1.) The officer's articulable facts must amount to more than a hunch. (Ibid.) Moreover, the *844 officer's reasonable suspicion is measured by an objective standard as to whether other officers in the same position would have suspected appellant of criminal activity at the time of detention. (In Re James (1987) 43 Cal.3d 903, 914, 239 Cal.Rptr. 663, 741 P.2d 161.) In determining the validity of a detention, we apply a totality of the circumstances test to see if the facts, taken together, amount to reasonable suspicion. (U.S. v. Sokolow, supra, 490 U.S. at p. 8, 109 S.Ct. 1581.)
The facts here, taken together, amounted to a reasonable suspicion that supported Officer Strain's detention of Celis outside his home. Based upon the information officers received in the Lynwood and Bellflower seizures, they suspected a continuation of the practice of drug smuggling using tires to take place at the San Diego residence under surveillance. The conduct of Ordaz and Celis with the tire, the pressure tank, the repeated trips to the tire store and the visit Celis made to Mexico were certainly consistent with the drug smuggling activities under investigation. When Celis rolled the inflated tire out of the house as Ordaz approached in a truck, it was reasonable for officers to suspect that "criminal activity was afoot." (Terry v. Ohio (1968) 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.) Thus the officers reasonably detained Celis and Ordaz in order to investigate the suspicious activity.
Celis contends the facts do not support a valid detention. Celis claims "where the events are as consistent with innocent activity as with criminal activity, a detention based on those events is unlawful." (Remers v. Superior Court (1970) 2 Cal.3d 659, 664, 87 Cal.Rptr. 202, 470 P.2d 11.) In Remers, two officers observed the defendant standing outside a pizza parlor with a male. The defendant looked over her shoulder, took a tinfoil package from her purse, and nodded for the man to follow her inside the pizza parlor. One officer said, "Valerie's got a deal going down." (Id. at p. 662, 87 Cal.Rptr. 202, 470 P.2d 11.) Officers arrested the defendant in the pizza parlor and searched her purse for the tinfoil and recovered Seconal tablets. (Id. at p. 663, 87 Cal.Rptr. 202, 470 P.2d 11.) The court held that the officers did not have probable cause to arrest defendant because the facts did not justify the officers' beliefs that defendant was involved in criminal activity since her actions were innocent and rendered the search invalid. (Id. at pp. 662, 665, 87 Cal.Rptr. 202, 470 P.2d 11.) Remers is inapposite to this case.
First, the facts are distinguishable. Although the activity of deflating, inflating, and rolling a tire is by itself innocent activity, the officers had more information causing them to believe that the tires played an important role in a drug smuggling operation. Moreover, the officers had an independent justification for surveillance of Celis's house because the car parked at Conception Street where officers believed the drug ring would continue was registered to his address. As the trial court stated:
"... I think the officers are allowed to take that connection that led them there into consideration, which would be different than if the officers simply decided to drive to Chula Vista and said, `Let's pick a house and sit on it and see if anybody is doing anything with a tire.' That's different than going there because there's a car that was connected to an address where they had received information that may have a connection with a tire-smuggling type of operation."
Second, Celis was not arrested when initially stopped. Since Celis was merely detained, the officers needed only reasonable suspicion to justify the stop. (Terry *845 v. Ohio, supra, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.) Once the protective sweep produced multiple bricks of cocaine, the officers had abundant facts to justify the arrest.

II

THE PROTECTIVE SWEEP
Celis argues that the protective sweep of his residence was unlawful because it was not based upon an exigent circumstance. "A `protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." (Maryland v. Buie (1990) 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (Buie).) Officers do not need probable cause to conduct a protective sweep, reasonable suspicion is sufficient. (Id. at p. 334, 110 S.Ct. 1093.) Officers need "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." (Ibid.)
Here, the officers had articulable facts justifying a protective sweep. From surveilling Celis's house for two days, the officers knew that his wife and possibly his son lived with him. The officers saw Ordaz at Celis's house. Officer Strain stopped Celis at his back door near an open window.[3] Celis's house was less than 500 square feet. Officer Strain testified that at the time of the detention, neither he nor the other officers knew if anybody else was inside the house and he was concerned that there might be armed people lying in wait for them. The officers' sweep lasted no longer than a minute and a half and they testified that they were searching for other suspects and looked in places where people might be hiding. The protective sweep was lawful.
Celis distinguishes this case from Buie, supra, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 because in Buie, the officers made the arrest inside the home and here, Celis was arrested outside his home. This same distinction was made in Maier, supra, 226 Cal.App.3d 1670, 277 Cal.Rptr. 667, and we responded:
"The basic question is whether the limited inspection of the premises was reasonable in each case, that is, was it in fact a protective sweep, based upon articulable and reasonable facts supporting a belief in possible danger to officers or others, or was it an otherwise impermissible warrantless search for evidence? This, rather than on which side of a door an arrest is effected, is the issue in these limited-inspection cases." (Maier, supra, 226 Cal.App.3d at p. 1675, 277 Cal. Rptr. 667.)
Further, Celis contends a mere possibility that suspects may be inside the house does not give rise to an exigent circumstance authorizing a protective sweep. We disagree. An exigent circumstance is "a situation where swift action is required to forestall imminent escape of a suspect, destruction of evidence or danger to life or property." (People v. Coffee (1980) 107 Cal.App.3d 28, 32-33, 165 Cal. Rptr. 676 [officers entered a bungalow after *846 all three suspects emerged because they believed there might be another suspect inside].) In Maier, supra, 226 Cal. App.3d 1670, 277 Cal.Rptr. 667, we upheld the validity of a protective sweep when officers first called the suspects out of the house before entering to look for other possible suspects that may still be inside. (Id. at p. 1674, 277 Cal.Rptr. 667.)
Here, the trial court reasonably found the protective sweep lawful because the officers did not know whether there were additional suspects in the house who may pose a threat while they detained Celis near the open window. The officers could reasonably fear for their safety because the house was small, the detention occurred a few feet from an open window and back door of the house, and the officers were not sure whether additional suspects may be inside to launch a surprise attack.

III

SEIZURE OF THE DRUGS IN PLAIN VIEW
Celis asserts the trial court's finding that the officers observed the cocaine in plain view inside his house is not supported by substantial evidence. "In reviewing the denial of a motion to suppress evidence, we view the record in the light most favorable to the trial court's ruling and defer to its findings of historical fact, whether express or implied, if they are supported by substantial evidence." (People v. Miranda (1993) 17 Cal.App.4th 917, 922, 21 Cal.Rptr.2d 785.) Substantial evidence "must be reasonable in nature, credible, and of solid value; it must actually be `substantial' proof of the essentials which the law requires in a particular case." (In re Teed's Estate (1952) 112 Cal.App.2d 638, 644, 247 P.2d 54.) Next, we determine the relevant legal principles and independently apply them to the particular facts to resolve whether an unreasonable search or seizure has occurred. (People v. Miranda, supra, 17 Cal.App.4th at p. 922, 21 Cal. Rptr.2d 785.)
Here, the officers saw the cocaine in a large box located in the kitchen while conducting the protective sweep. Officer Strain testified that he peered into the box because a small body could fit into it and he could see it in plain sight when he walked by it in the small kitchen. The box was partially covered by a lid with a basket on top. The photograph of the box showed there was ample space for the officers to look down into it and see the cocaine despite its partial cover. Also, Officer Davis testified that Officer Strain did not manipulate the cover in any way to view the contents in the box. Thus, substantial evidence supports the trial court's finding that the officers saw the cocaine in plain view inside Celis's house.

IV

VOLUNTARY CONSENT
Celis asserts he did not voluntarily give the officers consent to search his house. Voluntary consent is a product of the individual's free will rather than "a mere submission to an express or implied assertion of authority." (People v. James (1977) 19 Cal.3d 99, 106, 137 Cal.Rptr. 447, 561 P.2d 1135.) Whether consent is voluntary is "a question of fact to be determined in light of all the circumstances." (Ibid.) Again, we defer to the trial court's finding of fact if supported by substantial evidence and then independently apply the law to such facts. (People v. Miranda, supra, 17 Cal.App.4th at p. 922, 21 Cal.Rptr.2d 785.)
Here, the trial court found Celis voluntarily gave his consent to officers to search his house. Officer Strain testified that after the protective sweep, he asked *847 Celis if he could search his house and that Celis, through a police interpreter, replied he would show him where the drugs were inside. Strain further testified that Celis showed him the cocaine in the box. Strain then asked Celis to sign a consent to search form. Through the interpreter, Strain explained to Celis that he was not trying to coerce him to consent to the search, but he would instead seek a search warrant if Celis did not want to consent. Celis then replied that he understood and consented to the search. As the trial court found:
"I don't think the evidence establishes that there was any undue influence or pressure placed on him to coerce the consent. I think the record establishes that Mr. Celis decided for his own reasons that he wanted to engage in the conduct he did, which was going in and pointing things out and then signing the consent form."
We conclude that Celis, by his own free will, voluntarily gave officers his consent to search his house.
Celis also argues his consent was invalid because the police illegally entered his home before they obtained his consent. However, as we have already held, the entry into his house was lawful as a protective sweep.

V

THE ARREST
Celis asserts he was under arrest from the time the officers first approached him and his arrest was invalid because the officers did not have probable cause at that point. Celis relies on People v. Boyer (1989) 48 Cal.3d 247, 272, 256 Cal.Rptr. 96, 768 P.2d 610 (Boyer) (disapproved by People v. Stansbury (1995) 9 Cal.4th 824, 830, fn. 1, 38 Cal.Rptr.2d 394, 889 P.2d 588), to argue that in the absence of a formal arrest, the criteria is whether a reasonable person in his position would have believed he was under arrest. However, Celis's reliance on Boyer is misplaced. In Boyer, the issue was whether the defendant was in custody during an interrogation for Miranda purposes, not whether an arrest occurred. Also, as we already decided, Celis was detained, not arrested when officers first approached him. A detention requires only a reasonable suspicion that the suspect is involved in criminal activity. Thus, the officers did not need probable cause at that point.

DISPOSITION
The judgment is affirmed.
WE CONCUR: BENKE, Acting P.J., and HALLER, J.
NOTES
[1] Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.
[2] Officer Strain testified that the lid was off the box when he saw it in the kitchen. However, Officer Davis testified that there was a lid on the box. Davis further testified that Strain did not manipulate the lid during the sweep. Also, Strain testified that normally his investigative team takes photographs of objects in the condition that they are found. Thus, we are relying on the photograph of the large box covered by a partial lid with a basket on top that was admitted into evidence for an accurate description of how the box appeared when found in the kitchen.
[3] In People v. Maier (1991) 226 Cal.App.3d 1670, 277 Cal.Rptr. 667 (Maier), we noted that in analyzing protective sweeps under Buie, supra, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276, "[a]n accomplice on another floor is surely no more dangerous than one on the other side of a window, or a door." (Maier, supra, 226 Cal.App.3d at p. 1675, 277 Cal.Rptr. 667.)